WELCH, Judge.
Justin T. Hosch was indicted by the August 2009 Autauga County grand jury on one count of murder made capital for the killing of Joel Willmore during the commission of a robbery, § 13A-5-40(a)(2), Ala.Code 1975; one count of murder made capital for the killing of Joel Willmore during the commission of a burglary, § 13A-5-40(a)(4), Ala.Code 1975; one count of third-degree burglary for entering James Clifton’s dwelling with the intent to commit a theft therein, § 13A-7-7, Ala.Code 1975; and one count of second-degree theft for taking two revolvers from James Clifton, § 13A-8-4, Ala.Code 1975. The cases were tried before a jury beginning on August 14, 2010, and on September 1, 2010, the jury found Hosch guilty of the four charges. A sentencing hearing was held before the jury, and, at the conclusion of that phase of the trial, the jury recommended, by a vote of 10-2, that Hosch be sentenced to death for the capital offenses. On October 14, 2010, the trial court conducted a sentencing hearing, and it sentenced Hosch to death for the two capital convictions. The trial court sen *1059 tenced Hosch to consecutive 10-year terms of imprisonment for the burglary and theft convictions.[1] This appeal follows. We affirm.

Facts

The State presented evidence indicating that Justin Hosch had been incarcerated at the Frank Lee Youth Center, a minimum-security prison in Elmore County, having been convicted of first-degree possession of marijuana and receiving stolen property. On October 14, 2008, Hosch escaped from the prison. He was wearing a brown t-shirt and jeans at the time of his escape, and evidence indicated that he had taken that clothing from another inmate. Investigators learned that, in the days before the escape, Hosch had been talking on a cellular telephone to his sister, Kelli Hosch, who lived in Huntsville about escaping from prison and about Kelli driving him away from the area. Law-enforcement officers obtained Kelli’s telephone records during their investigation of Hosch’s escape. Law-enforcement witnesses testified that, during that investigation, they learned that Hosch was connected to a murder in Autauga County that occurred a few days after Hosch had escaped.
On October 16, 2008, Hosch knocked on the door of Terry Ingram’s house. Ingram’s residence was 1.45 miles- from the prison from which Hosch had escaped, “as the crow flies,” or in a straight-line distance. (R. 641.) Hosch asked Ingram if he could use his telephone, and Hosch told Ingram he had been hanging out at a bar with some friends until his girlfriend arrived and they had a fight. Ingram testified that he smelled alcohol on Hosch’s breath. He allowed Hosch to use his cell phone. Hosch told Ingram that he had called his sister in Huntsville and that she was going to come get him, and Ingram drove Hosch to the nearby BP gasoline station so Hosch could wait for his sister there.
Ingram testified that several days later he approached law-enforcement officers about his contact with Hosch. Three days after Ingram left Hosch at the BP station, Joel Willmore was found murdered at his automobile-repair shop near the BP station. Ingram testified that he knew from news reports that the authorities had no leads, and he kept seeing investigators at the BP store when he drove past; it weighed on him, he said, so he told investigators about Hosch. Ingram was shown a photographic lineup, and he identified Hosch as the person who had come to his house on October 16, 2008.
Michael Bowman testified that his mother owned the BP station at 101 County Road 40 West in Autauga County, and that he owned a fabrication shop directly behind the BP station. A car wash was also located behind and to the left of the BP station. Bowman testified that a chain-link fence separated his property from the car wash. Along that fence Bowman had been storing a white limousine and a tractor.- Bowman had returned from an out-of-town trip on October 19, 2008, and he heard that a murder had occurred nearby. Bowman testified that he was asked to review the footage from the surveillance cameras at the BP station. He said that there were 16 cameras at the station; 2 cameras were aimed toward his shop and its parking lot, and the rest of the cameras were aimed inside or toward the front of the BP station. In reviewing the surveillance footage beginning on October 16, 2008, he noticed that a man he could not identify had broken into the limousine and *1060 had been staying inside it. Bowman testified that he reviewed surveillance recordings from October 16, 2008, and he saw the man getting dropped off at thé BP station, •and he saw the man break into the limousine. The limousine was approximately 100 yards from the crime scene. Bowman said that his review of the surveillance recordings from October 16 through October 19 showed the man getting into and out of the limousine on more than one occasion, and it showed the man using the pay telephone at his mother’s BP station. Recordings of the surveillance videos showing the man, who was later determined to be Hosch, were admitted into evidence and played for the jury.
Ron Jones, the owner of the self-service car wash located next to the BP station, testified that he was at the car wash on October 19, 2008, the day Willmore was killed. Jones testified that he saw a white male walk along the fence between his ear wash and the fabrication shop located next to it. He stated that he was inside his motor home parked at the car wash when heard a loud noise — a muffled big bang— late that afternoon, around 4:00 or 4:30. He walked behind the car wash and looked around after he heard the noise. Jones identified recordings from the video surveillance system at the car wash, and said they depicted him walking behind the car wash and also depicted a vehicle traveling toward the interstate. The video recordings were admitted into evidence and played for the jury. Subsequent testimony established that review of the videotape established that Willmore’s truck was driven to the shop at 3:48 p.m. on October 19, 2008, and it was driven away at approximately 4:05 p.m. on October 19, 2008. The videotape depicted the truck traveling toward Interstate 65.
Jerry Evans testified that he drove to the BP station on October 19, 2008, and that a white male approached him and asked where Prattville was located. Evans told the man that they were in Pratt-ville. The man then asked him where the interstate was located, and Evans indicated the direction and told the man the interstate was two or three miles away. Four days later, on October 23, 2008, Evans was interviewed at the Autauga County Sheriffs Office and he was shown a photographic lineup. Evans identified Hosch as the man who had approached him at the BP station and had asked him about Prattville and the interstate.
James Clifton lived approximately one-quarter of a mile from the BP station. His house was burglarized on October 19, 2008. Clifton testified that he had left his house that morning and that when he returned he saw that someone had cut a window screen to gain entry into the house. Inside the house, next to that window, Clifton saw a t-shirt hanging across the television set. Law-enforcement officers collected the shirt, and forensic testing later revealed that DNA from the shirt matched Hosch’s DNA. Two .38 caliber Taurus revolvers were stolen during the burglary, and their serial numbers were TD 23245 and SI 76041.[2] Clifton told the officers that a box of .38 caliber ammunition had been stolen, too.
Shanna Wilcox’s residence was located next to Willmore’s shop, “[ljess than a football field away,” she said. (R. 824.) Wilcox testified that, on October 19, 2008, around 5:00 and 6:00 p.m., she heard a gunshot. Because it was close to hunting *1061 season and she had heard some dogs barking before she heard the shot, she did not investigate when she heard the gunshot, and she did not see anyone.
Scott Willmore (“Scott”) testified that Joel Willmore was one of his three older brothers. Willmore was a mechanic, Scott said, and he was building an automotive shop behind the BP station on County Road 40. Scott said that on October 19, 2008, at approximately 8:00 p.m., he received a telephone call from their mother, who told him that Willmore was missing and was not answering his phone. He drove to Willmore’s shop and went inside, and he saw Willmore lying on the floor. Scott ran to Willmore and grabbed his arm and called his name because he did not know if he was alive, but he could tell from touching Willmore that he was dead. He ran to the BP station, and summoned the sheriffs deputy he had seen there moments earlier. Willmore’s truck was not at the shop, Scott said. Scott identified a photograph of a red-and-white-paneled truck that looked like Willmore’s truck.
Sgt. Michael Rushton testified that he was employed with the Autauga County Sheriffs Office on October 19, 2008, and that he was patrolling in the county that evening. The sheriff had told him to pay attention to the Pine Level area of the county and to look for Willmore’s truck, which had been reported missing. Sgt. Rushton testified that he was in the area of the BP gas station when Scott Willmore flagged him down. He went inside Will-more’s automotive shop and saw Will-more’s body on the floor lying in a pool of blood.
Joe Sedinger testified that he was the chief deputy at the Autauga County Sheriffs Office but that in October 2008 he was the captain over the Investigations Unit at the Autauga County Sheriffs Office. Chief Sedinger was at the crime scene on the day Willmore was killed. He testified that, when he first entered the building he noticed Willmore’s body lying in a pool of blood, and he heard a radio “playing real loud.” (R. 843.) Chief Sedinger identified photographs of the crime scene and the victim’s body, and the photographs were admitted into evidence. Chief Sedinger testified that it appeared that Willmore had been shot on the left side of his head, 3bove his ear, and that the bullet had exited the right side of his head. Will-more’s right front pants pocket had been pulled out and was empty. Chief Sedinger found an expended .38 caliber bullet on a ledge at the corner of the building near the office door, and above the expended bullet he saw what appeared to be a bullet hole in the insulation. The blood at the scene and scuff marks on the floor indicated to Chief Sedinger that Willmore’s body had been moved after he was shot. A ball cap with what appeared to be blood on it was located approximately five feet from the body. An empty cellular telephone case was found beneath Willmore’s left leg. Willmore’s truck was not found at the scene.
Chief Sedinger testified that officers with the United States Marshals Office traveled to Autauga County and assisted county law-enforcement officers with the investigation of Willmore’s murder. United States marshals were also conducting a separate investigation of Hosch’s escape. Law-enforcement officers initially did not know that the two crimes were related. Deputy Marshal Athen Reeves was provided names, addresses, and telephone numbers related to the escape case, and he was then provided similar documents related to Willmore’ murder. One facet of the investigation into the murder involved the examination of the records of calls made from the pay telephone at the BP station, from Terry Ingram’s cell phone, and from Willmore’s cell phone. Records from Ingram’s phone and the pay telephone con *1062 tained calls to the same number with a “256” area code; that number was determined to belong to Hosch’s sister, Kelli Hosch. Records from the victim’s cell phone indicated that the user of the phone was traveling north. Deputy Reeves realized that the “256” number on the phone records was Kelli Hosch’s cell-phone number, and he notified other officers of his belief that the escapee was also the murder suspect.
United States marshals tracked calls from Kelli Hosch’s phone, and the investigation led them to a cab company in Huntsville. A cab driver at that company recognized Hosch from a photograph, and said he had driven Hosch the day before. Hosch was wearing a black stocking cap. The driver said Hosch had told him he had been released from prison. The cab driver said he dropped Hosch off at a “head shop” called Still Smoking.
Michael Adam Bailey testified that he worked at Still Smoking and that he knew Justin Hosch. Bailey said that Hosch had telephoned him on October 21, 2008, and said he wanted to get together and go out. Hosch came to the store and then they went to Bailey’s house. Hosch told him that he had been released from prison on good behavior, and he was looking for a job. He was contacted by United States marshals on October 24, 2008. He told the marshals that Hosch was at his house in Scottsboro, and he gave them permission to search his house. Bailey testified that he did not have a handgun there.
Hosch was apprehended on October 24, 2008, in Bailey’s house in Scottsboro. Evidence recovered during the search of the house included a loaded .38 caliber revolver that was determined to be one of the firearms stolen during the burglary of Clifton’s house — the TD gun; additional .38 caliber bullets; a black stocking cap; and a set of keys that included the key to the door of Willmore’s shop. The key ring also included two keys to General Motors vehicles; Willmore’s truck had been manufactured by General Motors. Forensic testing revealed that the TD gun recovered from Hosch was not the murder weapon.
Law-enforcement authorities interviewed Hosch on October 25, 2008. When Hosch was interviewed by Chief Sedinger and another officer, Hosch initially denied any knowledge of Willmore’s murder. After those officers left the interview room, Hosch summoned Autauga County Sheriff Herbie Johnson into the room when he saw the sheriff walk past. Hosch told the sheriff that he wanted to reveal the location of Willmore’s pickup truck. The sheriff told Chief Sedinger and then-Chief Deputy Donnie Nelson, and Hosch was interviewed a second time. During that interview Hosch admitted that he had knocked on Terry Ingram’s door; that he was the person depicted on the video recordings getting into and out of the white limousine behind the BP station; and that he had telephoned his sister and tried to get her to pick him up from that area, but she had refused to do so. Hosch also admitted that he broke into Clifton’s house and said he had to leave when someone drove up to the house. Chief Sedinger testified that Hosch maintained that he had stolen only one gun from Clifton, but when Chief Sedinger asked him something about the “guns,” Hosch said “Which one?” and then caught himself. He also told officers the general area where he had left Willmore’s truck.
Hosch wanted to take a break during the interview so he could smoke a cigarette. During the break, Hosch told Chief Nelson that he wanted to tell the whole story, and he returned to the interview room with the officers. During that interview Hosch confessed to the burglary of Clifton’s house, but he still maintained that he had taken only one gun during the *1063 burglary. He admitted that he killed Will-more and took his truck on the afternoon of October 19. He said he took the truck because he needed a ride to Huntsville, and he said he drove Willmore’s truck to Huntsville.
Hosch was interviewed briefly the following morning, October 26, 2008, because Hosch had initially told the officers that Willmore was bent over when Hosch shot him, but the forensic evidence was not consistent with that explanation. Hosch then told the officers that Willmore was standing up at the time of the shooting.
Officers made video recordings of all but the first interview with Hosch, and those recordings were played for the jury.
Although Hosch gave information about the location of the truck in Huntsville, and several law-enforcement agencies attempted to locate it, Willmore’s truck was never recovered.
On October 21, 2008, a criminal investigator with the Huntsville District Attorney’s office, Matt Thornbury, encountered Julius Pearson, who was also known as Julius Morris and “Boss,” during what the investigator had believed was a drug transaction. Thornbury found a .38 revolver partially hidden under the passenger seat where Morris had been sitting. Thornbury testified that Morris told him that he had received the weapon from an unknown black male who had escaped from prison in south Alabama. The weapon was taken from Morris and was placed in a secure evidence locker. A few months later, the gun was released to an investigator with the Huntsville Police Department, who was looking for .38 caliber guns that had recently been taken off the street. That investigator was going to have the gun tested as part of his investigation into an open homicide. He returned the gun to the district attorney’s office, and it was again placed in an evidence locker on June 8, 2009. Forensic testing was conducted on the firearm. In June 2010, approximately two months before trial, Thornbury was contacted by an investigator with the Autauga County Sheriffs Department, who said the gun “had a hit on it.” (R. 1309.) That gun was identified as the second one taken from Clifton’s residence during the burglary — the SI gun. Forensic testing revealed that the SI gun taken from Morris had fired the bullet that had been recovered from Willmore’s shop. Additional forensic testing revealed the presumptive presence of blood on the barrel bushing and inside the barrel of the gun recovered from Morris. DNA testing revealed an insufficient amount of DNA inside the barrel to allow for further processing. However, the DNA on the barrel bushing matched Hosch’s DNA.
Chief Sedinger testified that in June 2010, after it was discovered that the .38 caliber murder weapon had been recovered from Morris, he traveled to Huntsville and spoke with police officers and investigators. He also spoke with Morris because Morris had been in possession of the SI weapon. Chief Sedinger interviewed Morris twice. He attempted to find out how Morris came into possession of the murder weapon, and whether he was involved in Willmore’s murder. Chief Sedinger testified that he was not aware of any evidence linking Morris to Willmore’s murder. He said that, based on all the information gathered during the investigation, he arrested Hosch for the burglary of Clifton’s residence and the theft of the guns, and he also arrested Hosch for the murder of Joel Willmore.
Morris testified that he had dated Kelli Hosch for approximately a year and a half, beginning while Hosch was in prison. Morris stated that he met Hosch after Hosch had escaped from prison and returned to Huntsville. He said that Kelli had contacted him and that he and Kelli *1064 then drove to a location near the Redstone Arsenal in Huntsville to meet Hosch. He said that Hosch was standing next to a maroon and silver pickup truck that had two flat tires; additional evidence indicated that the truck looked like the one stolen from Willmore. Morris testified that he took Hosch to a room he had in a friend’s house, and Hosch told him how he had escaped from prison. Hosch also told Morris that he had killed a man. Hosch told Morris that he had gone into a man’s house to look for food and that he had taken money and two guns. Morris testified that Hosch said he then went to a garage and “shot the dude in the head.” (R. 1421.) Hosch had two .38 caliber firearms, both loaded, and extra ammunition, Morris said. Morris asked Hosch for the gun Hosch had not used to kill the man, because the guns looked brand new and he wanted a gun. They put the guns underneath the mattress in the room during the night. The next day, Morris left the house with the murder weapon and was stopped by investigators, who discovered the weapon. Morris told them that he had gotten the weapon from a white man who was still at his friend’s house. He said he did not tell them that Hosch had killed someone because he was not certain whether Hosch had told him that to appear tough. The investigators released Morris but kept the gun, he said. Morris said that he telephoned Kelli immediately and told her that the investigators had taken the gun Hosch had given him. Morris stated that he did not see Hosch in Huntsville again.
Morris said that, in October 2008, he and Kelli had been en route to pick up Hosch because Hosch had escaped from prison, but did not know where he was. Morris said they had turned around after only a short time, when Morris’s father telephoned him. He said his father had just returned from Iraq.
Morris said that he was interviewed twice after he was found with the gun. During the second interview, Morris said, officers were “trying to say that I had something to do with it,” and asked if he had helped Hosch escape or if he had helped him get the gun and kill Willmore. (R. 1439.) Morris said he never admitted being involved with Hosch because he had not been involved and had never left Huntsville.
Morris testified that he previously had been incarcerated for theft of property and destruction of evidence and that he was currently incarcerated for possession of a controlled substance.
Julius C. Morris, Jr. (“Mr. Morris”), testified that Morris is his son. He stated that he and his mother traveled to Huntsville in October 2008, and they stayed at a Marriott hotel. He identified a bill from his stay at the hotel. Mr. Morris testified that he notified his son that he was there and that Morris came to the hotel. He said that he believed he saw Morris on October 19, 2008.
The general manager of a Courtyard by Marriott hotel in Huntsville testified that her records showed that Julius Morris checked into that hotel on October 18, 2008, and checked out on October 21, 2008.
Dr. Scott Boudreau testified that he was a senior state medical examiner employed by the Alabama Department of Forensic Sciences, and he was accepted as an expert in the field of pathology. Dr. Boudreau performed the autopsy on Willmore. He determined that Willmore had been shot at close range and that the bullet entered just above his left ear, nicking the left ear before entering Willmore’s skull. Dr. Boudreau testified that he observed stippling, small red dots in the skin of the face and at the left temple, that indicated that gun had been fired from within two feet of Willmore’s head. The bullet exited in *1065 front of Willmore’s right ear and his right temple, slightly higher than its point of entry on the left side of the skull. The gunshot wound caused Willmore’s death, Dr. Boudreau testified.
The jury found Hosch guilty of the four charges that had been lodged against him, and the case proceeded to the penalty phase.
Hosch presented testimony from Dr. Patrick Bruce Atkins, a forensic psychiatrist, who said that Hosch suffered from posttraumatic-stress disorder as a result, in part, of his exposure to a very volatile, dysfunctional family that was extremely chaotic. Dr. Atkins testified that the divorce of Hosch’s parents during his formative years was also a traumatic experience for Hosch. He stated that Hosch had a developmental disorder as a child, and that he began abusing substances in early childhood as a means of escaping the trauma associated with his family. Hosch had no positive role models to teach him the proper way to behave and grow, and he was instead influenced by people with criminal backgrounds, thus negatively impacting his mental development, Dr. Atkins said. The problems led Hosch to have impaired judgment and poor impulse control. Additionally, Dr. Atkins testified, the absence of food or water during the four or five days following his escape could have caused confusion and delirium and impeded rational decision-making.
Hosch presented testimony from several family members: Peggy Adams, his paternal grandmother; John Mark Hosch, his father; Kelli and Brandy Hosch, Hosch’s older sisters; and Robert Hardy, with whom Hosch and his sisters lived for a few years after Hosch’s parents divorced, and who was, at the. time of trial, an Alabama Department of Corrections inmate with an extensive criminal history. The witnesses testified about the turmoil in Hosch’s upbringing, about the negative changes in Hosch’s behavior after his parents divorced, and about his exposure to violence and drugs and how that had influenced his behavior.
After hearing the testimony presented, the jury recommended that Hosch receive a death sentence. Ten jurors voted for the imposition of the death penalty, and two jurors voted for the imposition of a sentence of life imprisonment without the possibility of parole.
A presentence investigation was conducted, and a report of that investigation was prepared for the trial court. The trial court conducted a final sentencing hearing. The judge stated that he had read his notes from the trial, had reviewed the presentence report, had reviewed a pre-hearing brief submitted by the State, and had read letters submitted by several members of Hosch’s family on his behalf.
The State submitted documentary evidence regarding Hosch’s juvenile record and prior convictions. The State also presented testimony from Sgt. Jeff Fox of the Elmore County Sheriffs Department, who had been the warden at the county jail during the time Hosch was incarcerated there awaiting trial. Sgt. Fox testified that in December 2009, officers searched Hosch’s cell and found a shank, which he described as a “homemade object that could be used to stab, cut or injure any person,” secreted under the sink in the cell. (R. 1818.) Hosch told Sgt. Fox that he had not intended to harm him or any of the jail staff, but he said that he had intended to kill a certain inmate if that inmate opened the door to Hosch’s cell. Hosch also identified a second inmate and told Sgt. Fox that he would kill that inmate if he had the opportunity.
Hosch’s mother testified on Hosch’s behalf. She said that Hosch was remorseful, that he had been “saved” and would like to work in youth ministry, and that Hosch *1066 told her that he did not take Willmore’s life. She asked the court for mercy on her son’s life.
After considering all the evidence and the arguments of counsel, the trial court sentenced Hosch to death. The court found three aggravating circumstances to exist: that the capital offense was committed during the course of a robbery, § 13A-5 — 49(a)(4), Ala.Code 1975; that the capital offense was committed during the course of a burglary, § 13A-5-49(a)(4), Ala.Code 1975; and that the capital offense was committed by a person under a sentence of imprisonment, § 13A-5-49(l), Ala.Code 1975. The court found two statutory mitigating circumstances to exist: that Hosch had no significant history of prior criminal activity, § 13A — 5—51 (1), Ala.Code 1975; and Hosch’s age at the time of the crime, which was 21, § 13A-5-51(7), Ala.Code 1975. The trial court discussed its reasons for making the foregoing findings and the weight it had assigned to the statutory aggravating and mitigating circumstances. The trial court discussed nonstatutory mitigating circumstances offered by Hosch and stated at the outset:
“This Court has considered all of the non-statutory mitigating evidence presented by Hosch. As outlined below, Hosch submitted testimony and argument to the jury on the following non-statutory mitigating circumstances: that he was diagnosed with post-traumatic stress disorder; that he was raised in a dysfunctional family; that he was raised with no or few positive role models; that he grew up around criminals and violence; that he has been diagnosed with a developmental disorder; and that he has a problem with substance abuse.”
(C. 499.)
The court then discussed the evidence Hosch had presented during the penalty phase of the trial in support of the nonstat-utory mitigating circumstances, and it discussed the weight it assigned to that evidence and its reasons for assigning the weight that it did.
Finally, the court weighed the aggravating and mitigating circumstances and determined that Hosch should be sentenced to death on the capital-murder convictions. The court also sentenced Hosch to a total of 10 years’ imprisonment on the burglary and theft convictions.
This appeal follows. We will address the issues in the order Hosch has presented them in his brief to this Court.

Standard of Review

Because Hosch has been sentenced to death, this Court must search the record of the trial proceedings for plain error. See Rule 45A, Ala. R.App. P., which states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
The scope of plain-error review is well defined:
“Plain error is defined as error that has ‘adversely affected the substantial right of the appellant.’ The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public *1067 reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.1993).”
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999).
“[T]he plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).
I.
Hosch first argues that the circuit court erred when it ruled that the State did not violate Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), during jury selection. Specifically, Hosch argues that the reasons the State gave the trial court for its peremptory strikes of three black veniremembers were pretextual, that the reasons were not supported by the record, and that the State treated black and white veniremembers disparately. The State argues that the trial court did not err when it denied Hosch’s Batson motion.
The record indicates that the venire from which Hosch’s jury was selected consisted of 59 potential jurors, 52 whites and 7 blacks. After the trial court granted strikes for cause, there remained 39 white veniremembers and 4 black venire-members. The State struck three black veniremembers. Hosch’s jury was composed of 11 white jurors and 1 black juror. Hosch argued to the trial court that the State had removed 75% of the available black veniremembers and that it had violated Batson when it used peremptory strikes to eliminate those veniremembers on the basis of race. The trial court required the State to provide race-neutral reasons for its strikes of the three black jury veniremembers: L.H., L.P., and F.T.
The State explained that it struck L.H. because she indicated that she would recommend a sentence of life imprisonment without the possibility of parole, no matter what and because she said that she felt that if a person committed a crime he should sit in prison and think about it, rather than “get the satisfaction of being put to death.” (R. 542.) The prosecutor told the court that the State had struck all veniremembers who the prosecution team believed had the same position.
The State then explained that it struck L.P. because he had a prior felony conviction for shooting into an occupied dwelling and because he gave confusing answers to questions about his thoughts on the death penalty and life without the possibility of parole.
The State initially stated that it struck F.T. because he had indicated his opposition to the death penalty and because he had answered on the juror questionnaire that he believed that the death penalty was used too much. The Stated then added that F.T. had two felony drug convictions and that F.T. had explained during voir dire, at length, that he was diabetic and that the medication he took might interfere with his ability to pay attention during the trial.
Hosch did not make any further argument about the State’s strikes. The trial court noted that the State had also struck white veniremembers who had prior convictions. The court then held that the State had set forth race-neutral reasons for its strikes, and it denied the Batson motion.
*1068 Hosch’s arguments on appeal— that the State’s reasons for the strikes were pretextual, unsupported by the record, and applied only to black venire-members — were not raised at trial, but are being raised for the first time on appeal. Therefore, we review those arguments for plain error only. See Lee v. State, 898 So.2d 790, 815 (Ala.Crim.App.2001)(review-ing for plain error only the appellant’s challenges to the State’s reasons for strikes that the appellant had not first raised in the trial court).
“ ‘When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001). ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.’ Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).”
Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010).
Evaluation of a claim of racial discrimination in jury selection involves a three-step process established in Batson:
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. 476 U.S., at 96-97. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The defendant raising a Batson claim “carries the ultimate burden of persuasion.” Batson, 476 U.S. at 94 n. 18.
The trial court did not find that Hosch had made a prima facie case of racial discrimination. The court stated, however:
“Out of an abundance of caution, however, in the event that some reviewing Court later may decide that I am in error in saying that the defense did not set forth a prima facie showing sufficient to move forward to the next leg, I will go ahead and ask the State to tell me who those strikes are and the reasons for those strikes and we will see where we go from there.”
(R. 542.)
The State then gave the reasons for its strikes, as set out above. “[0]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.” Hernandez v. New York, 500 U.S. 352, 358-60, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). We turn, then, to the second and third steps in evaluating the State’s strikes.
The trial court determined that the State’s reasons for striking the three black veniremembers were race neutral. A race-neutral reason is a reason “based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.” Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d *1069 395 (1991). “In evaluating the race-neutrality of an attorney’s explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.” Id. A juror’s reservations or mixed feelings about the imposition of the death penalty is a race-neutral reason for peremptorily striking a veniremember. Dallas v. State, 711 So.2d 1101, 1104 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998). A veniremember’s prior involvement in criminal activity is a race-neutral reason for a peremptory strike. Brown v. State, 982 So.2d 565 (Ala.Crim.App.2006); Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009). The fact that a prospective juror lacks mental acuity is a race-neutral reason for a peremptory strike. Johnson, 43 So.3d at 12. Hosch does not contest or object to any of the prosecutor’s stated reasons for its challenges, nor did he object to the trial court’s determination that the prosecutor’s reasons were race neutral. Therefore, we turn to the third step.
“ ‘Once the prosecutor has articulated a race-neutral reason for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext.’ Ex parte Branch, 526 So.2d 609, 624 (Ala.1987).” Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010). The Alabama Supreme Court in Ex parte Branch explained:
“Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
“1. The reasons given are not related to the facts of the case.
“2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
“3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck.
“4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors.
“5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the veni-re.
“6. ‘[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’ Slappy [v. State ], 503 So.2d [350] at 355 [(Fla.Dist.Ct.App. 1987)]. For instance, an assumption that teachers ás a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
526 So.2d at 624 (some citations omitted). Of the foregoing types of evidence, Hosch argues only that the State engaged in disparate treatment. He argues, also, that the State exercised its first six peremptory strikes to remove three of the four black jurors on the venire.
“In light of both parties’ submissions, the trial court must determine whether the defendant has carried his or her burden of showing purposeful discrimination. See Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997); Ex parte Branch, 526 So.2d at 624. See also Fletcher v. State, 703 So.2d 432, 435 (Ala.Crim.App.1997) (‘When the defendant challenges as pretextual the prosecutor’s explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65 (1991).’). In making that *1070 determination, the trial court must confront the ‘decisive question’ and evaluate the credibility of the prosecution’s explanation, Hernandez v. New York, 500 U.S. 352, 365 (1991), ‘in light of all evidence with a bearing on it,’ Miller-El v. Dretke, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). See also Miller-El v. Cockrell, 537 U.S. at 338-39. Cf. Greene v. Upton, 644 F.3d 1145, 1155 (11th Cir.2011) (‘Batson does not require elaborate factual findings. See Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003); see also Hightower v. Terry, 459 F.3d 1067, 1072 n. 9 (11th Cir.2006) (“We may therefore make ‘the common sense judgment’ — in light of defense counsel’s failure to rebut the prosecutor’s explanations and the trial court’s ultimate ruling — that the trial court implicitly found the prosecutor’s race-neutral explanations to be credible, thereby completing step three of the Batson inquiry.”)’). In addition, ‘ “[t]he explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor’s other peremptory strikes, and as well, in light of the strength of the prima facie case.” ’ Ex parte Bird, 594 So.2d 676, 683 (Ala.1991) (quoting Gamble v. State, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987)). In other words, all relevant circumstances must be considered in determining whether purposeful discrimination has been shown. See, e.g., Snyder v. Louisiana, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (‘[I]n reviewing a ruling claimed to be a Bat-son error, all of the circumstances that bear upon the issue of racial animosity must be consulted.’).”
Sharp v. State, 151 So.3d 342, 361 (Ala.Crim.App.2010) (or remand from the Supreme Court and on application for rehearing).
“ ‘The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses.’ ” Harris v. State, 2 So.3d 880, 899 (Ala.Crim.App.2007) (quoting Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991)). The trial court’s conclusion on discriminatory intent will be reversed only if that decision is clearly erroneous. E.g., Harris v. State, 2 So.3d 880, 899 (Ala.Crim.App.2007). “A finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Id. (internal quotation marks and citations omitted). Because Hosch did not argue in the trial court that the State’s reasons for striking the black venire-members were pretextual, we have no ruling from the trial court regarding the credibility of the State’s reasons. Thus, we must review Hosch’s argument on this issue for plain error.
This Court stated in Martin v. State, 62 So.3d 1050 (Ala.Crim.App.2010):
“It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). ‘Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ Battle v. State, 574 So.2d 943, 949 (Aa.Crim.App.1990).”
62 So.3d at 1059-60. L.P. and F.T. were struck for the valid, race-neutral reason that they had prior convictions. Based on MaHin, supra, this sufficiently race-neu *1071 tral reason is adequate, and no determination concerning any other reason given by the prosecutor needs to be made.[3] Id. at 1059.
Hosch argues that the State’s assertion that it struck all veniremembers who were opposed to the death penalty was a pretext because it failed to individually question or strike L.T., a white female veniremember who, on her jury questionnaire, expressed opposition to the death penalty. The State’s failure to conduct meaningful voir dire examination of a veniremember may be evidence that an explanation for a strike was a sham or a pretext, Hemphill v. State, 610 So.2d 413, 416 (Ala.Crim.App.1992), but it is not always dispositive, e.g., 155 So.3d at 1069. See also Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir.2009) (“Neither a prosecutor’s mistaken belief about a juror nor failure to ask a voir dire question provides ‘clear and convincing’ evidence of pretext. McNair [v. Campbell,] 416 F.3d [1291,] 1311-12 [(11th Cir.2005)].”); United States v. Novaton, 271 F.3d 968, 1004 (11th Cir.2001) (“ ‘[Flailing to strike a white juror who shares some traits with a struck [non-white juror] does not itself automatically prove the existence of discrimination.’ United States v. Stewart, 65 F.3d 918, 926 (11th Cir.1995).”).
The State argues, and our review of the record reveals, that the State struck all other veniremembers, white and black, who indicated that they were opposed to, or had a hesitancy about imposing, the death penalty. Thus it appears that the' prosecutor overlooked L.T.’s answers in her juror questionnaire indicating her doubts about the death penalty. In a similar case, Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001), the appellant argued for the first time on appeal that the prosecutor had engaged in disparate treatment because the prosecutor had not struck a white veniremember for her opposition to the death penalty even though the prosecutor struck two black veniremembers based on their “ ‘imagined opposition to the death penalty [that was] disputed by the record.’ ” 898 So.2d at 815 (quoting Lee’s brief, at p. 22). The record reflected that one of the black veniremembers who was struck, D.G., was not unalterably opposed to the death penalty and said he would consider the death penalty. This Court held that the trial court did not commit plain error when it denied the Batson motion and stated, in relevant part:
“It appears that the prosecutor was simply mistaken about veniremember D.G.’s views about the death penalty. ‘ “ ‘A prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral.’ ” Reese v. City of Dothan, 642 So.2d 511 (Ala.Cr.App.1993).’ McElemore v. State, 798 So.2d 693, 698 (Ala.Crim.App.2000). The record does not indicate that the prosecutor’s reason was not based on an honest belief.”
Lee v. State, 898 So.2d 790, 815-16 (Ala.Crim.App.2001).
Based on the authority of Lee v. State, we hold that the record does not support Hosch’s argument that the reasons the State gave for its strikes of the black veniremembers were pretextual or a sham. The record also does not indicate that the prosecutor’s reason for not questioning or striking L.T. was anything other than an honest, mistaken belief regarding L.T.’s *1072 feelings about the death penalty as expressed on her juror questionnaire.
Hosch had the ultimate burden of proving the alleged Batson violation, and that burden was made heavier by Hosch’s failure to argue at trial the State’s reasons were pretextual.
“[T]he ‘error’ that must exist to warrant disturbing the prosecutor’s peremptory strikes is actual, purposeful discrimination in the selection of the jury. It is this actual, purposeful discrimination then, rather than merely a prima facie case for such discrimination, that must be ‘plain’ in the trial-court record if we are to provide a defendant who fails to object timely to a prosecutor’s strikes relief from those strikes on a posttrial basis.”
Ex parte Floyd, [Ms. 1080107, Sept. 28, 2012] — So.3d -, - (Ala.2012) (Murdock, J., concurring in the result). Hosch did not prove actual, purposeful discrimination by the State as the result of its failure to strike L.T.
“Under the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial. See Ex parte Walker, 972 So.2d 787, 752 (Ala.2007) (recognizing that the appellant has the burden to establish prejudice relating to an issue being reviewed for plain error).... ”
Petrie v. State, [Ms. CR-09-0386, Feb. 15, 2013] — So.3d -, - (Ala.Crim.App.2013). Hosch failed to establish either. The plain-error standard also required Hosch to establish that the alleged error was particularly egregious and that it “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.” Ex parte Price, 725 So.2d 1063 (Ala.1998). Hosch established neither. Finally, this Court has stated, “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). The record indicates no unfair impact on the jury’s deliberations resulting from the State’s oversight.
Considering all the relevant circumstances in determining whether a Batson violation occurred, we hold that the circuit court did not commit plain error when it denied Hosch’s Batson motion. The alleged disparate treatment appeared to be the result of an oversight, especially in light of the fact that the State struck all other white and black veniremembers who expressed hesitancy about the death penalty. Any oversight by the prosecutor did not rise to the level of plain error, resulting in a miscarriage of justice that warrants a reversal for a new trial. For all of the foregoing reasons, we hold that Hosch is not entitled to relief on this claim of error.
II.
Hosch next argues that the trial court erred when it refused to grant challenges for cause against veniremembers M.W., J.H., and J.J. Hosch exercised peremptory challenges against M.W. and J.H., but did not strike J.J., who served on the jury.
Section 12-16-150, Ala.Code 1975, lists grounds for challenging a juror for cause. One of the grounds is that the juror has a fixed opinion of the defendant’s guilt that would bias the juror’s verdict. § 12-16-150(7), Ala.Code 1975.
The standards for appellate review of a trial court’s rulings on challenges for cause are well established. In Scott v. State, [Ms. CR-08-1747, Oct. 5, 2012] — So.3d - (Ala.Crim.App.2012), this Court stated:
*1073 “ ‘To justify a challenge for cause, there must be a proper statutory ground or “‘some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.’” Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.CrApp.1983)). This Court has held that “once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions” about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror “need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.” Kinder v. State, 515 So.2d 55, 61 (Ala. Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror “ ‘must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused’ “ ‘[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.’ ” Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App. 1989)).’
“Ex parte Davis, 718 So.2d 1166, 1171— 72 (Ala.1998).
“ ‘A trial judge is in a decidedly better position than an appellate court to assess the credibility of the jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala. Crim.App.1993). For that reason, we give great deference to a trial judge’s ruling on challenges for cause. Baker v. State, 906 So.2d 210 (AIa.Crim.App. 2001).’
“Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002).”
Scott, — So.3d at -. See also Dailey v. State, 828 So.2d 340, 342-43 (Ala.2001)(quoting with approval Minshew v. State, 542 So.2d 307, 309 (Ala.Crim.App.1988)).
A.
Hosch first argues that the circuit court erred when it denied his challenge for cause of juror M.W. because, he says, M.W. had a “lifelong and close relationship with Mr. Willmore and Mr. Willmore’s brother” that established “probable prejudice” that would disqualify him as a juror. (Hosch’s brief, at p. 21.)
The record reflects that M.W. stated during individual voir dire that he had heard “|j]ust the basics of the case when it happened,” because he worked at the same mill where Willmore’s brother, Rusty, worked. (R. 431.) He also said that he had heard “some stuff regarding what was found that night” but that the information was no longer fresh in his mind because he had heard it two years earlier. M.W. said that he had known all four Willmore brothers since the early 1970s because he went to school with them and he thought they had been in a Boy Scout troop together. The relationship with the Willmores had mostly been in the past, he said, although he saw Rusty weekly at work.
The trial court asked M.W. whether he would be able set aside all that he had *1074 heard and base his verdict solely on the evidence at trial and the legal principles provided by the court, and M.W. said, “I believe I can.” (R. 432-33.)
The court then asked:
“Would you be able to set aside — • taking into consideration that you grew up with this family, would you be able to set that aside and make your decision based solely on the evidence that’s presented to you and on the law that I give to you?”
(R. 433.) M.W. said, “I believe so.” (R. 433.)
Hosch moved to strike M.W. for cause and argued: “He had heard some publicity about the case through where he was working and everything. I think just the situation of him working with the brother creates a potential for him to be prejudiced against the defense and we would move to strike for cause.” (R. 530.) The trial court responded: “While [M.W.] works at International Paper with Rusty, the decedent’s brother works out there, they don’t work in the same place. He said they saw each other about weekly and he answered that it would not affect him, so that motion is denied.” (R. 530.) Hosch exercised a peremptory strike against M.W.
First, the record refutes Hosch’s claim that M.W. had a “lifelong and close relationship” with Willmore and his brother. Rather, M.W. stated that he grew up with the Willmores and saw Rusty at work weekly, but that any close relationship had been in the past, when he went to school with the Willmores. M.W. clearly stated that he could set aside the fact that he had grown up with the Willmore family and decide the case only on the evidence presented in court and the legal principles provided by the court. Second, M.W.’s answers during voir dire demonstrated that, although he heard information about the crime at work, he had heard only the basics of the case right after Willmore was murdered and that he could decide the case based solely on the evidence at trial and the law as instructed by the trial court.
The trial court was in the best position to determine whether M.W. was biased because it heard the tenor of his responses and observed his demeanor. Revis v. State, 101 So.3d 247, 305 (Ala.Crim.App.2011). The trial court’s decision on the challenge for cause is due great deference, and we hold that the trial court did not abuse its discretion by denying Hosch’s challenge to M.W.
B.
Hosch next argues that the circuit court erred when it denied the motion to challenge J.H. for cause. Hosch contends that J.H. had knowledge of the case and had formed an opinion as to Hosch’s guilt, that he indicated that he would likely be distracted if he were selected to serve on the jury, that he would not credit testimony given by a witness who was testifying as part of a plea bargain with the State, and that he believed execution was the appropriate punishment for everyone who committed an intentional murder.
During group voir dire J.H. responded affirmatively to questions asking the following: whether he had read or heard about the case (R. 384-85); whether the death penalty was the appropriate punishment in every intentional-murder case (R. 378); whether he had anything “going on at home” that would distract him from the trial (R. 410-11); whether he would have a problem crediting testimony from a State’s witness when the testimony was offered in exchange for a reduced sentence in another case (R. 414); and whether prison was too easy on the inmates (R. 418). J.H. also stated that he had formed an opinion about the case. (R. 424.) During individ *1075 ual voir dire the court and the parties asked J.H. questions about his initial responses.
J.H. testified that he had read about the “the basics” of the crime in the local Pratt-ville newspaper, but he remembered only a few details about it. (R. 488.) Addressing that issue and J.H.’s statement that he had an opinion about the case, the trial court questioned J.H. to determine whether he could judge the case based on the evidence and the law as presented at trial:
“In order to be to sit as a juror, like I told y’all this morning, your responsibility is to listen to and look at the evidence and y’all are the ones that decide what really happened.
“PJ [J.H.]: Yes, sir.
“THE COURT: And then once y’all decide what the true facts in the case are, you apply the law as I give it to you to those facts and putting those things together is how you ultimately reach a decision in the case. In order to successfully do that, we’ve got to be able to set aside whatever preconceived notions we might have, whatever our gut might tell us coming in, and make sure that the decision we make is only based on what we hear and what we see in Court and not on something else.
“PJ [J.H.]: Yes, sir.
“THE COURT: So that’s the question, you know, whether you’re able to do that or not.
“PJ [J.H.]: Yes, sir.
“THE COURT: You can do that?
“PJ [J.H.]: Yes, sir.”
(R. 488-89.)
Thus, J.H. clearly stated, several times, that he could put aside his preconceived opinion about the case, along with what he had read or heard about the case, and he could render a decision based on the evidence presented at trial and the law as provided by the trial court.
When the trial court asked J.H. about his response to the question about being distracted by something at home, J.H. stated that that was not an issue for him and that he had intended to respond to a different question. (R. 491.) Again, individual voir dire questioning removed the concern about J.H.’s ability to sit on the jury.
Hosch asked J.H. about his answer on the juror questionnaire indicating that he did not “like” a sentence of life imprisonment without parole. (Supp. C. 86.)[4] J.H. explained that he believed that people who committed intentional murder deserve the death penalty and should be swiftly executed. (R. 490.) The following colloquy ensued:
“THE COURT: [J.H.], would you be able to — regardless of those initial feelings, if y’all came back with a verdict and found Mr. Hosch guilty and we moved to the penalty phase, then there would be more evidence that we would hear and look at. I mentioned to y’all earlier that we would talk about aggravating circumstances and mitigating circumstances and y’all would be called on to weigh those—
“PJ [J.H.]: Yes, sir.
“THE COURT: — in making your recommendation to me as to what the appropriate punishment would be.
“PJ [J.H.]: Yes, sir.
“THE COURT: Would you be able to base your decision on that evidence and on the law as I give it to you on those factors?
“PJ [J.H.]: Yes, sir.
“THE COURT: Regardless of how your gut tells you you feel coming in?
*1076 “PJ [J.HJ: Yes, sir.”
(R. 490-91.)
Again, J.H. stated repeatedly that he could set aside his general feelings about sentencing, in murder cases' and that he would be able to base a penalty recommendation on the evidence he heard at trial and on the law as provided to him by the trial court.
“ ‘[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.’ ” Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008) (quoting Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000)). J.H. clearly stated that he could set aside any preconceived notions and decide the question of guilt and recommend a sentence based only on the evidence presented and the relevant legal principles. The trial court was in a far better position to judge J.H.’s demeanor and the tenor of his answers, and the trial court’s ruling is entitled to great weight. The court did not abuse its substantial discretion in denying this challenge for cause.
C.
Hosch next argues that the trial court erred when it refused to strike J.J. for cause. J.J. indicated during general voir dire that she had heard or read something about the case. During individual voir dire J.J. was asked what she had heard or read. J.J. said, “I remember seeing it on television and I remember reading about it, but it’s been quite a while and I don’t remember details. I just do remember being aware of the case.” (R. 477-78.) When the trial court asked J.J. whether she could set aside whatever she had heard or read, and base her decision only on the evidence, and the law presented, J.J. said, “I believe so.” (R. 478.) The trial court asked what would prevent J.J. from deciding the case based solely on the evidence and the law, and J.J. stated, “Well, I don’t know, it’s just the best I could say. I hate to give definites, positive or completely negative, but I believe I could.” (R. 478.) J.J. continued to give equivocal answers as the judge asked her questions, but ultimately it was clear from her answers that she would make her decision only on the law and the facts in the trial and that she had no preconceived notions that would prevent that.
In his brief Hosch has incorrectly identified the question at the conclusion of the J.J.’s individual voir dire. (Hosch’s brief, at pp. 24-25.) The voir dire questioning ended as follows:
“THE COURT: Well, can you tell me—I’m going to turn it around on you. I used to be a lawyer. What would affect you in making your decision other than on the evidence and what we hear and see and all of that and on the law? What else would affect you in making your decision, do you think?
“PJ [J.J.]: I don’t know.
“THE COURT: Okay.
“PJ [J.J.]: I don’t know that there would be something else.
“THE COURT: Okay. That’s what I need to know. I can work with that. “PJ [J.J.]: Okay.”
(R. 480.)
Although Hosch argues that J.J.’s equivocal, statements warranted her removal for cause and that her weak claims that she could be impartial did not establish that she could set aside any bias, we disagree. As we have already stated, a trial judge’s ruling on a challenge for cause is based on a prospective juror’s demeanor and credibility, and it is entitled to great weight and will not be disturbed on appeal unless in so ruling the judge abused his or her discretion. Scott v. State, [Ms. CR-08-1747, Oct. 5, 2012] — So.3d - (Ala. *1077 Crim.App.2012). A juror need not be excused merely because she has read or heard about the case to be tried. Id. As long as the juror can set aside her opinions and try the case based only on the law and the evidence, there is no basis for a strike for cause. Id.
The State in its brief has accurately described the situation:
“[J.J.] indicated that she had no preconceived notions; rather, the record indicates that her hesitancy to give an unequivocal response on how she would be affected by exposure to pretrial publicity was due to a general hesitancy to give unequivocal answers regarding any issue. Her answers consistently indicated that [she] could reach a verdict based on the evidence presented and the law and that she had no preconceived notions regarding Hosch’s guilt or innocence.”
(State’s brief, at p. 35.)
We agree with the State, and we find no abuse of the trial court’s discretion in denying the challenge for cause. J.J. indicated that nothing she was aware of would prevent her from making a decision in this case based on the law and the facts. As an appellate judge has observed:
“Some and perhaps many or even most jurors will not be able to profess certitude about what them state of mind will be and what they will be able to do. Indeed, a juror’s honesty can be manifested precisely by his or her reluctance or inability to be definitive about such matters.”
People v. Rivera, 33 A.D.3d 303, 312, 821 N.Y.S.2d 569, 576 (2006) (McGuire, J., concurring specially), aff'd, 9 N.Y.3d 904, 843 N.Y.S.2d 532, 875 N.E.2d 24 (2007).
In conclusion, we hold that the trial court did not abuse its substantial discretion when it denied any of the challenges for cause discussed above. Hosch is not entitled to relief on this claim of error.
III.
Hosch next argues that the trial court erred when it failed to adequately instruct the jury about how to consider evidence of Hosch’s two prior felony convictions.
Hosch testified in his own defense at trial. On cross-examination the prosecutor elicited testimony that Hosch had been convicted of possession of marijuana and of receiving stolen property. During its oral charge the trial court instructed the jury on the limited use for the prior convictions:
“There have been a couple of witnesses that have testified that have been asked about prior felony convictions. You can consider those prior convictions for the purposes of impeachment; that is, if you think it’s important, you can think about those or consider those in determining the weight and credibility that you wish to place on that particular witness’s testimony.”
(R. 1602-03.)
Hosch now argues that the trial court’s instruction was not adequate because, he says, “at no point did the trial court instruct the jury that it could not consider these convictions as substantive evidence of guilt, and that these convictions could only be considered in determining the defendant’s credibility.” (Hosch’s brief, at p. 29, citing Ex parte Minor, 780 So.2d 796 (Ala.2000).) Hosch raises these arguments for the first time on appeal.
Rule 21.3, Ala. R.Crim. P., provides, in relevant part:
“No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating *1078 the matter to which he or she objects and the grounds of the objection.”
Hosch did not submit a request for a limiting instruction along with his other written requested charges, nor did he request a limiting charge during the charge conference. Nonetheless, the trial court instructed the jury about the limited purpose for which testimony about prior convictions could be used. Hosch did not thereafter object to the trial court’s charge. Therefore, we review this argument for plain error.[5]
It is well settled law that a trial court has broad discretion in formulating its instructions to the jury, so long as the instructions accurately state the law. Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000). “In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ ” Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996).
In Ex parte Billups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court held that, if evidence is admitted pursuant to Rule 404(b), Ala. R. Evid., the trial court must instruct the jury on the specific purpose or purposes for which the evidence was admitted and not merely provide the jury a “laundry list” of the permissible uses of Rule 404(b) evidence in all cases. The trial court’s instruction here clearly limited the jury’s use of the prior convictions for impeachment. The instruction properly limited the jury’s consideration of Hosch’s prior convictions, in accordance with Ex parte Billups and its progeny. This Court must presume that the jury followed the trial court’s instructions unless there is evidence to the contrary. Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008).
Hosch argues that the instruction was faulty because it did not specifically state that the jury could consider the convictions “only” for the purposes of impeachment. Hosch cites no Alabama authority requiring any specific language in the jury instruction, and we know of no such legal authority. Moreover, the clear language of the instruction the trial court gave indicates that the convictions could be considered “only” for the purposes of impeachment. By instructing the jurors that they could consider testimony about prior convictions for impeachment and to determine the credibility of the witness’s testimony, the trial court necessarily excluded the jurors’ consideration of the testimony for any other purpose. No additional words were needed to convey that point to the jury.
Hosch also argues that the trial court was required to instruct the jury that it could not use the convictions as substantive evidence of guilt, and he relies on Ex parte Minor, 780 So.2d 796 (Ala.2000). We disagree. In Ex parte Minor the Alabama Supreme Court held that the trial court has a duty to sua sponte in *1079 struct the jury that evidence of prior convictions is not to be considered as substantive evidence of guilt. However, the following year in Snyder v. State, 893 So.2d 482 (Ala.2001), the Alabama Supreme Court limited the holding in Minor.
In Snyder v. State, 893 So.2d 471 (Ala.Crim.App.2001), this Court relied on Ex parte Minor and held that the trial court had committed plain error when it failed to instruct the jury that evidence of Snyder’s prior conviction could not be considered as substantive evidence that he had committed the crimes, even though the trial court had instructed the jury that the evidence of Snyder’s prior conviction could be used only for impeachment purposes.
The Alabama Supreme Court reversed our judgment. Snyder v. State, 893 So.2d 482 (Ala.2001). The Alabama Supreme Court distinguished Minor, noting that the jury in Minor had heard prejudicial testimony about the details of his prior offenses and that that was further compounded by the prosecutor’s arguments to the jury regarding Minor’s explanations for the prior convictions. In contrast, Snyder did not testify extensively about his prior conviction, and the prosecutor did not emphasize it during his closing argument. The trial court had instructed Snyder’s jury that testimony about a prior conviction was permitted for one purpose — for the jury’s consideration of the credibility of the witness. In reversing this Court’s judgment, the Alabama Supreme Court stated:
“Here, the trial court properly instructed the jury as to the purpose of the evidence of Snyder’s prior conviction. If an instruction clearly informs the jury of the sole purpose of prior-conviction evidence — the witness’s credibility — it is reasonable to assume that the jury would not use the evidence for any other purpose. See, e.g., Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)(recognizing that jurors are presumed to follow instructions). Unlike the circumstances in Ex parte Minor, where the jury could have used the testimony for whatever purpose it desired — to determine a witness’s credibility or as substantive evidence of the defendant’s guilt — the trial court in this case informed the jury that the prior-conviction evidence had ‘one purpose’ and that that purpose was to determine credibility; consequently, it eradicated the necessity of informing the jury that it would be improper to use the evidence as substantive evidence of guilt. The unambiguous instruction adequately cautioned the jury, explicitly stated the sole purpose of the testimony, and eliminated the risk that the evidence would be used improperly. Therefore, the emphasis in the instruction on the one purpose of the evidence overcomes a finding that the alleged error ‘has or probably has adversely affected the substantial right of [Snyder].’ Rule 45A, Ala.R.App.P. To hold that the trial court is required to inform the jury that prior-conviction evidence cannot be used as substantive evidence, would unnecessarily limit the trial court’s discretion in forming jury instructions, would restrict defense counsel’s trial strategy, cf. United States v. Barnes, 586 F.2d 1052, 1059 (5th Cir.1978), and in certain circumstances may unnecessarily emphasize the prejudicial evidence. Therefore, while the instruction to thé jury must state either that prior-conviction evidence can be used only for the purpose of assessing a witness’s credibility or state that such evidence may not be used as substantive evidence of the defendant’s guilt of the crime charged, it is not reversible error per se if the trial court does not instruct both as to the admissible purpose of the *1080 prior-conviction evidence and the purpose for which such evidence may not be considered, unless counsel requests such a two-pronged instruction and the instruction is supported by the evidence.
“Under the facts presented here, the trial court’s instruction to the jury on the use of the evidence of Snyder’s prior' conviction was a correct statement of the law; it did not constitute plain error.”
893 So.2d at 486-87. See also Ex parte Martin, 981 So.2d 759, 768 (Ala.2004) (“[I]n Snyder v. State, 8[93] So.2d 482, 485 (Ala.2001), we limited the holding of Minor, stating, ‘each inquiry regarding the propriety of an instruction on the use of evidence of prior convictions presented for impeachment purposes must be determined on a case-by-case basis.’ ”).
We hold that this case is not materially distinguishable from Snyder. Hosch testified that he had prior convictions, but he gave no details of either crime; the prosecutors did not mention the prior convictions in closing argument; and the trial court instructed the jury as to the limited use for the prior-conviction testimony. Under these facts, and in light of Hosch’s failure to timely request the two-pronged instruction that he now argues should have been given and his failure to object to the limiting instruction the trial court did give, we do not find any error, and certainly no error rising to the level of plain error.
For the foregoing reasons, we hold that Hosch is not entitled to relief.
IV.
Hosch next argues that the trial court erred when it admitted evidence of the circumstances of his escape, including testimony about “instances of misconduct committed during the planning and the execution of the escape.” (Hosch’s brief, at pp. 31-32.) He argues that the evidence was admitted in violation of Rule 404(b), Ala. R.Crim. P., and that its only purpose was to portray him as a career criminal who could not be believed. Hosch also argues that, even if the evidence was admissible, the trial court erred when it failed to give an instruction limiting the jury’s consideration of the evidence. Hosch is raising these issues for the first time on appeal, so we review them for plain error.[6]
A.
Hosch argues, more specifically, that the trial court erred when it permitted the following testimony: Jeremy Scott Gimm, who had been incarcerated with Hosch, testified that Hosch had stolen a t-shirt and a pair.of blue jeans from him before the escape; and Officer Irvin Richardson testified as to his conversations with inmates about Hosch’s illegal use of a cell phone to make calls to his sister during the preparations for his escape while Hosch was supposed to have been working. He argues that the evidence was unrelated to the crime for which he was on trial, that it was not reasonably necessary to the State’s case, and that its probative value was far outweighed by its prejudicial value. The State argues, in part, that the evidence was admissible to show the sequence of events to complete the story for the jury.
*1081 Alabama courts have often stated that a trial court has substantial discretion in determining whether evidence is admissible and that a trial court’s decision will not be reversed unless its determination constitutes a clear abuse of discretion. E.g., Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This general rule applies to decisions on the admission of collateral-acts evidence. See Bailey v. State, 75 So.3d 171, 183 (Ala.Crim.App.2011), and cases cited therein.
Rule 404(b), Ala. R. Evid., provides that evidence of other crimes is not admissible as evidence of bad character, but it may be admissible for other purposes, such as to prove motive, opportunity, or preparation.
This Court has considered cases similar to Hosch’s. For example, in Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010), a capital-murder case, Doster argued that evidence that he had escaped from jail and had burglarized several businesses and a residence was not relevant, and that the admission of the evidence violated Rule 404(b), Ala. R.Crim. P. This Court rejected Doster’s argument after setting out the relevant legal principles, which we quote below:
“Alabama has long recognized the following exceptions to the general exclusionary rule now contained in Rule 404(b), Ala. R. Evid.:
“ ‘ “These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scien-ter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes.” ’
“Scott v. State, 353 So.2d 36, 38 (Ala.Crim.App.1977), quoting Wharton’s Criminal Evidence, § 31.
“As Professor Charles Gamble explained:
“ ‘Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term “res gestae” because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the “complete story” of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“ ‘Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute “other crimes, wrongs, or acts” as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — i.e., that such acts are merely offered, rather than to prove bad *1082 character and conformity therewith, to show all the circumstances surrounding the charged crime.’
“C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed.1996) (footnotes omitted).
“ ‘[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[t]ell the complete story so as not to confuse the jury.” ’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the- Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.’); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“‘The ‘complete story1 exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to •prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105,109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence actually presented seems improbable or incredible.’).
“As we stated in Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997):
“‘We agree with the trial court’s ruling in receiving evidence of collateral offenses under the above exceptions. “The two crimes are in *1083 tertwined and connected to such an extent that they form one continuous transaction.” Bush [v. State ], 695 So.2d [70,] 86 [(Ala.Crim.App. 1995)]. C. Gamble, McElroy’s Alabama Evidence, § 70.01(12)(b) (5th ed.1996), in regard to the res gestae exception, states, “The prosecution may prove the accused’s commission of collateral crimes, wrongs or acts if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide.” ’ ”
72 So.3d at 87-89.
In Doster, we determined that the collateral-act evidence was relevant:
“Clearly, evidence of the collateral crimes that were committed during the two-week crime spree was correctly received into evidence in order to tell the complete story of the actions of Doster and his codefendant from the time they escaped from the Covington County jail on November 4, 2002, until they were eventually apprehended in Texas on November 18, 2002. The collateral offenses explained how Doster and Phillips came to be in possession of the murder weapon, how they obtained the clothes they were wearing when they were arrested, how they obtained certain other items that were discovered in the truck, and the extent of their efforts to elude police after their escape from the Covington County jail.”
72 So.3d at 89.
The same rationale applies here. The evidence about which Hosch now complains was relevant to show Hosch’s planning of the escape, including the sequence of events before and after the escape, and to complete the story for the jury. Testimony regarding Hosch’s cellular telephone calls before his escape were relevant to show his attempts to induce his sister to help him escape, and that testimony was relevant to show how the authorities investigating Willmore’s murder linked that crime to the prison escape. Subsequent evidence established that Hosch’s DNA was found on the brown t-shirt Gimm reported missing after Hosch’s escape and that Hosch left in Clifton’s house during the burglary. Because evidence regarding Hosch’s preparations before the escape was part of the res gestae and was related to the crimes for which Hosch was on trial, it was properly admitted as. part of the continuous course of conduct under Doster. See also Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013); Centobie v. State, 861 So.2d 1111, 1124-27 (Ala.Crim.App.2001).
B.
Hosch argues that, even if the evidence was properly admitted, the trial court erred in failing sua sponte to give the jury a limiting instruction. The Alabama Supreme Court in Johnson v. State, 120 So.3d 1119 (Ala.2006), resolved this issue adversely to Hosch.. Johnson was convicted of capital murder for killing a man who had been a grand-jury witness for the State of Alabama in a bigamy prosecution against Johnson. Evidence of Johnson’s bigamy conviction and numerous other prior bad acts, including evidence that she attempted to manipulate several men with whom she was having relationships to kill the victim, was admitted at trial without a limiting instruction. This Court held that all the evidence was admissible, either as part of an unbroken chain of events or to prove state of mind, motive, and intent but found plain error as a result of the trial court’s failure to give a limiting instruction as to the prior bad acts other than the bigamy conviction. The Alabama Supreme Court reversed and stated that all the evidence was offered, not as impeachment evidence, but as substantive evidence of the capital crime with *1084 which Johnson was charged. The Court then stated:
“It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense. Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See People v. Coney, 98 P.3d 930 (Colo.Ct.App.2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res gestae and may be admitted without a limiting instruction); State v. Long, 173 N.J. 138, 171, 801 A.2d 221, 242 (2002) (evidence of the defendant’s actions ‘served to paint a complete picture of the relevant criminal transaction’ and therefore was admissible, and a limiting instruction was unnecessary because the evidence was admitted under the res gestae exception); and Camacho v. State, 864 S.W.2d 524, 535 (Tex.Crim.App.1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction).
“Accordingly, we conclude that the trial court did not commit plain error in failing to give the jury a limiting instruction regarding its use of the evidence relating to Johnson’s prior bigamy conviction and her prior bad acts, including her adulterous relationships, sexual manipulations, and proddings, because that evidence, as discussed above, was properly admitted as substantive evidence of the offense with which Johnson was charged and was not offered for purposes of impeachment.”
Johnson v. State, 120 So.3d at 1129-30. See also Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013) (“Here, the prior bad acts were admitted as substantive evidence of guilt and not for impeachment purposes. Thus, the circuit court committed no plain error in failing to sua sponte give a limiting instruction on the use of the Rule 404(b), evidence.”).
For the foregoing reasons, Hosch is not entitled to relief on this allegation of error.
V.
Hosch next argues that the trial court erred when it failed to instruct the jury on two statutory mitigating circumstances: that the capital offense was committed while Hosch was under the influence of extreme mental disturbance, § 13A-5-51(2), Ala.Code 1975, and that he was an accomplice in the capital offense and that his participation was relatively minor, § 13A-5-51(4), Ala.Code 1975. He also argues that the trial court erred when it failed to give the complete pattern jury instruction on § 13A-5-51(6), regarding his impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Finally, Hosch argues that the trial court erred when it failed to give his proposed instructions, which further defined the term “mitigating circumstance,” that, he says, would have informed the jury that mitigating evidence need not rise to the level of a justification or an excuse to be mitigating. We will review the first and second arguments for plain error because Hosch is raising them for the first time on appeal. The failure to object weighs against Hosch’s claim of prejudice. E.g., *1085 Ex parte Boyd, 715 So.2d 852 (Ala.1998). Hosch objected to the trial court’s failure to give his proposed instructions, so this argument was preserved for review.
Jurors in a capital-murder case must receive thorough instructions on aggravating circumstances and mitigating circumstances and the process of weighing those circumstances so that they are adequately instructed on how to make their sentencing recommendation. The trial court has substantial discretion in formulating the jury instructions, so long as they accurately reflect the law and the facts of the case, and the court’s charge, as a whole, must be considered when reviewing challenges to any portion of the charge. E.g., Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013). A defendant in a capital ease is entitled to jury instructions on mitigating circumstances “so long as some evidence has been presented to support a finding of mitigating circumstances.” Ex parte Wood, 715 So.2d 819, 822 (Ala.1998).
The trial court instructed the jury on three statutory mitigating circumstances and on nonstatutory mitigating circumstances. First, the court stated: “A mitigating circumstance is any circumstance that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without parole.” (R. 1794.) The court also instructed, in relevant part:
“The laws of this state provide that mitigating evidence should include, but not be limited to, the following enumerated mitigating circumstances; one, that the defendant has no significant history of prior criminal activity. Two, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Three, the age of the defendant at the time of the crime.
“Mitigating circumstances shall also include any aspect of the defendant’s character or record or any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death. And any other relevant mitigating circumstance that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, such as, he was diagnosed with posttraumatic stress disorder; he was raised in a dysfunctional family; he was raised with no or few positive role models; he grew up around criminals and violence; he was diagnosed with a developmental disorder; and/or he had a problem with substance abuse.”
(R. 1799.)
A.
Hosch did not request that the trial court instruct the jury on the statutory mitigating circumstances set out in § 13A-5-51(2), Ala.Code 1975, that the defendant was under the influence of extreme mental or emotional disturbance, and § 13A-5-51(4), Ala.Code 1975, that the defendant was an accomplice in the capital offense and his participation was relatively minor. Hosch did not present evidence in an attempt to prove that those mitigating circumstances existed, and he did not argue to the jury that the evidence he had proffered supported those mitigating circumstances. There is no requirement that the trial court read to the jury the entire list of statutory mitigating circumstances when there exists no evidence supporting those circumstances. Burgess v. State, 723 So.2d 742, 768 (Ala.Crim.App.1997). The trial court instructed the jury that it could consider any aspect of Hosch’s character or record or any other evidence offered by Hosch as a basis for a sentence of life imprisonment, and it specifically listed the evidence Hosch presented as nonstatutory mitigation. We have previously held that the trial court did not *1086 commit plain error when it did not sua sponte instruct the jury on a statutory mitigating circumstance the appellant had not offered. Pressley v. State, 770 So.2d 115, 142 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.2000).
The evidence Hosch now argues would have supported an instruction on § 13A-5-51(2), Ala.Code 1975, was presented to the jury, and Hosch argued to the jury that the evidence constituted nonstatutory mitigation and that the evidence supported a finding that Hosch’s capacity to appreciate the criminality of his conduct or conform it to the requirements of the law was limited, see § 13A-5-51(6), Ala.Code 1975. The jury was instructed about statutory and nonstatutory mitigation, including that specific evidence Hosch presented. No plain error occurred as a result of the trial court’s failure to sua sponte instruct the jury on the § 13A-5-51(2) mitigating circumstance.
As for Hosch’s minimal argument that the trial court erred when it failed to instruct the jury that it could consider the § 13A-5-51(4) mitigating circumstance— that he was an accomplice and that his participation was relatively minor — the evidence did not support an instruction on this mitigating circumstance, Hosch did not request that this instruction be given, he did not argue to the jury that the circumstance applied to his case, and he did not object to the trial court’s failure to sua sponte give the instruction. Hosch’s participation in this crime was not relatively minor, even under Hosch’s version of the events. No plain error occurred.
B.
Hosch also argues that, even though the trial court instructed the jury on the § 13A-5-51(6) mitigating circumstance regarding Hosch’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, the court erred when it failed to give the complete pattern jury instruction. Hosch did not object to this alleged error at trial.
The trial court’s jury charge on the § 13A-5-51(6) mitigating circumstance initially followed the pattern jury instruction when it instructed the jury that it could consider whether “the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.” (R. 1799.) The trial court did not read the paragraph of the pattern instruction that stated:
“A person’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is not the same as his ability to know right from wrong generally, or to know what he is doing at a given time, or to know that what he is doing is wrong. A person may indeed know that doing the act that constitutes a capital offense is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensible to what he is doing or how wrong it is. Further, for this mitigating circumstance to exist, the defendant’s capacity to appreciate does not have to have been totally obliterated. It is enough that it was substantially lessened or substantially diminished. Finally, this mitigating circumstance would exist even if the defendant did appreciate the criminality of his conduct if his capacity to conform to the law was substantially impaired, because a person may appreciate that his actions are wrong and still lack the capacity to refrain from doing them.”
Alabama Pattern Jury Instructions— Criminal for the penalty phase, at pp. 27-28.
“It is the preferred practice to use the pattern jury instructions in a capi *1087 tal case.” Ex parte Hagood, 777 So.2d 214, 219 (Ala.1999). However, Alabama courts have not held that a trial court’s failure to follow the pattern instruction in its entirety results in reversible error. In this case, the portion of the proposed jury instruction the trial court omitted simply restated the components of statutory mitigating circumstance in different terms. The language of the mitigating circumstance, itself, however, was clear and was not susceptible to multiple different interpretations; rather, the instruction provided by the trial court was self-explanatory and it adequately apprised the jury of the mitigating circumstance. The omission did not preclude the jury from considering any of Hosch’s proffered mitigating evidence. We note, too, that Hoseh’s failure to object to the trial court’s omission of this paragraph from the pattern jury instruction weighs against any claim of prejudice.
Plain error is error that has or probably has adversely affected a substantial right of the appellant, Rule 45A, Ala. R.App. P., or error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Hooks v. State, 534 So.2d 329, 351-52 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988). For an error to affect substantial rights, it must have been prejudicial and it must have affected the outcome of the proceeding. United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Our review of the penalty-phase instructions given by the trial court reveals no error or plain error. There is no indication that the fairness or integrity of the proceeding was affected, and Hosch is not entitled to relief on this portion of his claim of error.
C.
Hosch also argues that the trial court erred when it failed to give the jury his proposed jury instructions that, he says, would have informed jurors “that a mitigating circumstance should be considered even though it does not constitute a justification or an excuse.” (Hosch’s brief, at p. 43.) He also argues that this alleged error, combined with the trial court’s omission of part of the pattern jury instruction on the § 13A-5-51(6) mitigating circumstance, “limited the jury’s ability to give full consideration to all factors that would support a verdict of life imprisonment without parole.” (Hosch’s brief, at p. 43.) We disagree.
The trial court’s charge clearly instructed the jury on the broad scope of mitigating evidence. The trial court stated: “A mitigating circumstance is any circumstance that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without parole.” (R. 1794.) The trial court also instructed the jury that “[mjitigating circumstances shall also include any aspect of the defendant’s character or record or any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.” (R. 1799.) Nothing in those instructions suggested to the jurors that proffered mitigation had to rise to the level of a justification or an excuse for the crime before it could be considered as mitigation. The instructions clearly informed the jury otherwise. Hosch offers no controlling legal authority for his claim that the trial court erred in failing to instruct the jury that his proffered mitigation did not have to rise to the level of a justification or an excuse. The jury charge adequately defined mitigating evidence, and it in no way limited the jury’s ability to give full consideration to all of Hosch’s proffered mitigation evidence, notwithstanding Hosch’s argument to the contrary. Thus, the substance of Hosch’s proposed instructions was covered by the trial court’s charge, and the court’s refusal to give the defendant’s written charge was *1088 not error. Hinkle v. State, 67 So.3d 161, 166 (Ala.Crim.App.2010). Hosch is not entitled to relief on this portion of the claim.
VI.
Hosch next argues that the trial court erred when it failed to give several more of his proposed jury instructions at the penalty phase. As we stated in the previous portion of this opinion, jurors in a capital-murder case must receive thorough instructions on aggravating circumstances and mitigating circumstances and the process of weighing those circumstances so that they are adequately instructed on how to make their sentencing recommendation, and the trial court has substantial discretion in formulating the jury instructions so long as they accurately reflect the law and the facts of the case. The jury charge, as a whole, must be considered when reviewing challenges to any portion of the charge. E.g., Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013).
A.
Hosch argues that the trial court should have instructed the jury that it could consider only statutory aggravating circumstances and, more specifically, that it could not consider the impact of the crime on the victim’s family as an aggravating factor. The trial court should have instructed the jury that it could not consider nonstatutory aggravating circumstances, Hosch says. We disagree.
The trial court instructed the jury on the two statutory aggravating circumstances that overlapped the guilty verdicts — that the murder was committed during the course of a robbery and burglary. § 13A-5-49(a)(4), Ala.Code 1975. The trial court then charged the jury:
“The additional aggravating circumstance proffered by the State that you may consider is limited to the following, that being that the capital offense was committed by a person under a sentence of imprisonment. The State has the burden of proving beyond a reasonable doubt the existence of the aggravating circumstance that I just went over.”
(R. 1796-97.)(Emphasis added.)
Viewing the instruction as part of the entire charge and as a reasonable juror would have interpreted it, as we must do, e.g., Reynolds v. State, 114 So.3d 61, 148-49 (Ala.Crim.App.2010), we hold that the trial court’s instructions to the jury accurately conveyed that it could consider only the three statutory aggravating circumstances delineated in the jury charge. There is no merit to Hosch’s claim of error.
B.
Hosch argues that the trial court erred when it failed to give the jury his proposed instructions that stated that his proffered evidence did not have to rise to the level of justification or excuse in order to be considered as a mitigating circumstance. We addressed this allegation of error in Part V.C. of this opinion, in response to Hosch’s initial discussion of the alleged error, and we rejected it.
C.
Hosch next argues that the trial court erred when it failed to give the jury his proposed instruction informing the jury that he would spend the rest of his life in prison if he were sentenced to life imprisonment without parole. Hosch has cited no legal authority that supports his argument. His citation to Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), is inapposite. The issue addressed in Simmons is not the same as the issue Hosch has raised, because the jury in Simmons was told that the jury could recommend a sentence of “life imprisonment” or death, and the jury could have believed that Simmons *1089 might be eligible for parole if he received a sentence of life imprisonment. The Simmons Court stated: “We hold that where the defendant’s future dangerousness is at issue, and state law prohibits the defendant’s release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible.” 512 U.S. at 156. The trial court in Hosch’s case, however, instructed the jury repeatedly that Hosch would be sentenced to death or to life imprisonment without the possibility of parole. Thus, Simmons does not require a reversal here.
Furthermore, this Court held that a trial court did not err when it refused to instruct the jury that it must assume that a defendant sentenced to life imprisonment without the possibility of parole will spend the rest of his life in prison. Martin v. State, 548 So.2d 488, 498-94 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.1989).
Thus, Hosch is not entitled to relief on this claim of error.
D.
Hosch argues that the trial court erred when it failed to instruct the jurors that, in order to consider an aggravating circumstance, they first had to unanimously find that the aggravating circumstance was proved beyond a reasonable doubt. We disagree.
The State sought to prove three aggravating circumstances: that the capital offense was committed during the course of a robbery, § 13A-5-49(a)(4), Ala.Code 1975; that the capital offense was committed during the course of a burglary, § 13A-5-49(a)(4), Ala.Code 1975; and that the capital offense was committed by a person under a sentence of imprisonment, § 13A-5-49(l), Ala.Code 1975.
The trial court repeatedly instructed the jury in accordance with the pattern jury instructions that the State had the burden to prove beyond a reasonable doubt the existence of an aggravating circumstance. The trial court also correctly instructed the jurors that, “before you can recommend a death sentence, each of you must be convinced beyond a reasonable doubt that one or more aggravating circumstances exists.” (R. 1768.) Although the trial court did not use the word, “unanimous,” the foregoing instruction adequately conveyed that meaning, and a reasonable juror would have interpreted the instruction to include a unanimity requirement for aggravating circumstances.
Furthermore, the trial court also correctly instructed the jury that, as a result of its verdicts on the charges of burglary-murder and robbery-murder, it had already determined that two aggravating circumstances existed and had to be considered in the sentencing determination. (R. 1794-95.) As to the first two aggravating circumstances on which the State relied, the jury’s verdicts at the guilt phase established unanimity as to those findings. See Morris v. State, 60 So.3d 326, 364-65 (Ala.Crim.App.2010).
Finally, even if the trial court erred by failing to instruct the jurors that they had to “unanimously” find the existence of the third aggravating circumstance in order to consider that circumstance, any error was harmless. Hosch acknowledged throughout the trial that he had escaped from prison. Thus, the jury’s finding that the circumstance existed would not have been erroneous. Rather, as the Alabama Supreme Court explained in Ex parte Stephens, 982 So.2d 1148 (Ala.2006):
“An error in a penalty-phase jury instruction is subject to harmless-error review. Ex parte Broadnax, 825 So.2d 233, 236 (Ala.2001). However, ‘[t]he harmless error rule is to be applied with *1090 extreme caution in capital cases.’ Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala.1984). To find the error in this capital case harmless, we must be able to state ‘beyond a reasonable doubt’ that a properly instructed jury would nevertheless have recommended a sentence of death. 482 So.2d at 1248.”
Ex parte Stephens, 982 So.2d at 1153-54.
We can state beyond a reasonable doubt that the jury would have recommended a sentence of death even if the trial court had instructed the jury that it had to find “unanimously” the third aggravating circumstance. Any error in the jury charge was harmless, and Hosch is due no relief on this claim of error.
VII.
Hosch next argues that several of the prosecutor’s penalty-phase closing arguments were improper because, he says, they denigrated the jury’s role, diminished the jury’s sense of responsibility, and undermined the reliability of the proceedings. Hosch did not raise any of these claims during the prosecutor’s closing argument, so we review them for plain error. Rule 45A, Ala. R.App. P. As this Court stated in Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990):
“ ‘While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice. ’ Ex parte Kennedy, 472 So.2d [1106] at 1111 [(Ala.1985)] (emphasis in original). ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). ‘Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.’ United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.), cert. denied, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986).”
577 So.2d at 489.
Moreover, the trial court instructed the jury several times that arguments of counsel were not evidence and should not be considered as evidence. Jurors are presumed to follow the court’s instructions. See Burgess v. State, 827 So.2d 134, 162 (Ala.Crim.App.1998).
With these principles in mind, we examine Hosch’s claims about the prosecutor’s arguments to the jury.
A.
Hosch contends that the district attorney improperly argued to the jury in his opening argument during the penalty phase:
“Now, I submit to you when I make this decision as District Attorney what I look at are the factors, the same factors you’re looking at. When a completely innocent person is murdered, brutally murdered, so that an inmate can escape to Huntsville, there are no mitigating circumstances in my mind that will ever outweigh the aggravating circumstances. When completely innocent people die for stupid reasons, that’s when we impose the death penalty.”
(R. 1642.) Hosch says that the district attorney in his closing argument also improperly argued that “[t]he death penalty is reserved only for those cases that we feel deserve it. It’s my decision to ask you for that. I have to make that decision.” (R. 1781.)
Hosch argues that the district attorney’s argument was based on facts not in evi *1091 dence and that it improperly indicated to the jury that, as the county’s elected representative, he had already determined that a death sentence was the appropriate sentence for Hosch. This infringed on the jury’s role in making a sentencing recommendation, he says. We disagree.
Having reviewed the prosecutor’s entire opening and closing arguments, with specific attention to the context of the arguments to which Hosch now objects, we find no error. The prosecutor stated at the beginning of his opening argument:
“I know that the decision you’ve already reached has been difficult and I’m going to ask you today to make one more difficult decision.
“As the District Attorney, it’s my job to decide what cases we ask you to impose the death penalty in. And it’s a tough job, but I can’t do it. If I could take that burden from you, I would, but I can’t. The law in Alabama says that a jury of Autauga County citizens must make that recommendation. So it’s not just me, I can’t do it alone, I have to have you to start that process.”
(R. 1628.)
We have reviewed the penalty-phase arguments as a whole, and in the context of the entire trial, as we are required by legal precedent to do. The district attorney made it clear throughout his arguments to the jury at the penalty phase that he had initiated the process of seeking the death penalty but that the jury was responsible for considering the evidence and weighing the aggravating and mitigating circumstances, then making a recommendation as to the sentence. Neither of the arguments Hosch cites diminished the jury’s sense of responsibility or denigrated the jury’s role. No error occurred.
B.
Hosch also argues that the district attorney diminished the jury’s sense of responsibility when he told the jury that the law regarding mitigating circumstances was designed to “benefit” the defendant, and he maintains that the argument implied that the cards were stacked in favor of the defendant. We disagree.
After explaining to the jury that the State would proffer evidence to prove aggravating circumstances in support of the death penalty and that the defendant would offer mitigating circumstances in support of a sentence of life imprisonment without parole, the district attorney discussed the weighing process and the aggravating circumstances on which the State was relying. The district attorney then defined and discussed mitigating circumstances and gave examples of mitigating circumstances that might be proffered to support a sentence of life imprisonment without parole. He then said: “This process is designed to benefit the defendant. That’s why he’s allowed to bring whatever he wants to before you. He can bring anything that he thinks lessens his culpability in your mind to your attention.” (R. 1639.) The district attorney then gave several more examples of mitigating circumstances and said: “Any of those things can be brought to your attention or brought before you to determine whether a mitigating circumstance exists sufficient to justify imposition of life without parole.” (R. 1639-40.)
Nothing in the prosecutor’s argument could reasonably be interpreted as an implication that the cards were stacked in Hosch’s favor, or that Hosch had some improper advantage in the sentencing process.
Hosch failed to demonstrate that the district attorney’s remarks constituted error, much less plain error. He is entitled to no relief.
*1092 VIH.
Hosch argues that the trial court erred in failing to exclude his statements from evidence. Specifically, he argues that his statements were the product of the interrogating officers’ assurances and false advice and that they were coerced. Hosch filed a pretrial motion to suppress his statements, but he did not object on the ground that the statements were coerced. Therefore, we review this argument for plain error. Rule 45A, Ala. R.App. P.
The trial court held a hearing on Hosch’s motion to suppress. The interrogating officers who testified at the hearing provided substantially identical details of the interrogation as they did at trial, and the trial testimony was set out in the statement of facts in this opinion. The parties filed briefs in support of their respective positions. The trial court entered an order denying the motion to suppress.
Hosch has abandoned the arguments for suppression he presented to the trial court and argues before this Court that the investigators coerced him into confessing by telling him that if he cooperated, he could potentially help his case. We find no coercion, and no plain error in the admission of Hosch’s statements.
“When reviewing a ruling on the volun-tariness of a confession, we apply the standard articulated by the Alabama-Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“ 'For a confession, or an inculpato-ry statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“ ‘The Fifth Amendment to the Constitution of the United States provides in pertinent part: “No person ... shall be compelled in any criminal case to be a witness against himself. ...” Similarly, § 6 of the Alabama Constitution of 1901 provides that “in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.” These constitutional guarantees ensure that no involuntary confession, or other in-culpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“ ‘It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, “if his will has been overborne” by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“‘The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the “totality of the circumstances.” Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, *1093 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala. Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App. 1978) (stating that the true test to be employed is “whether the defendant’s will was overborne at the time he confessed”) (emphasis added).’ ”
“718 So.2d at 729 (footnote omitted).”
Brown v. State, 56 So.3d 729, 737-38 (Ala.Crim.App.2009).
We have reviewed the totality of the circumstances and conclude that the record does not indicate that Hosch’s will was overborne when he gave his statements. Hosch had completed the 11th grade and had obtained a G.E.D.; he had prior experience with law-enforcement officers; he was not threatened or deprived of physical necessities; and he was offered breaks during the interviews. Telling Hosch that he could not make things worse for himself by telling the truth and that, if he told admitted his role in the crime, he could tell the prosecutor that he had taken responsibility did not constitute illegal inducements. As the Alabama Supreme Court has stated: “Absent the exertion of physical or psychological force or any particular and peculiar susceptibility to inducement on the part of McLeod, the officer’s stating that he would make McLeod’s cooperation known to the district attorney was, under the totality of the circumstances, insufficient to taint McLeod’s confession as involuntary.” McLeod v. State, 718 So.2d 727, 730 (Ala.1998) (footnote omitted). Hosch presented no evidence or argument to the contrary, and nothing in the record would support a finding that the trial court committed plain error by admitting Hosch’s statements. Hosch is not entitled to relief on this argument.
IX.
Hosch argues that the prosecutor improperly vouched for the credibility of a State’s witness. Specifically, he claims that the prosecutor should not have told the jury in opening argument that the defense theory — that Julius Morris had committed the murder — was not believable because officers had interrogated Morris and were convinced that he was not involved in the crime. He also claims that the State asked improper questions of Chief Sedinger and of Morris on direct examination to demonstrate that investigators had used hard tactics while questioning Morris but did not find any evidence linking him to the murder. Hosch did not raise these objections at trial. We review them for plain error, Rule 45A, Ala. R.App. P., and we find none. ■
In Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010), a case that presented similar circumstances, we addressed the relevant legal principles and found no plain error:
“ ‘There is a general principle that one may not bolster the credibility of his own witness before that credibility has been attacked by the opponent. However, this traditional preclusion has been held inapplicable to preclude a calling party from anticipating such an attack and diffusing bias impeach *1094 ment by himself bringing out the bias-revealing matter on direct.’
“McElroy’s Alabama Evidence § 149.01(15) (footnotes omitted).
“Furthermore:
“ ‘[A] party may not bolster the credibility of his own witness until it first has been attacked. This principle, however, in no way precludes a party from diffusing the impact of possible impeachment by bringing out the impeaching information on direct. A witness’ inconsistent statement, for example, may be brought out on direct so as to diffuse the prejudicial impact such information would have if first brought out by the opponent.’
“McElroy’s Alabama Evidence § 116.01(2).
“It is apparent from the record that the defense intended to elicit testimony that Chad Martin and John Langley were originally suspects in the crimes and that Chad Martin purportedly confessed to the crimes. By eliciting the fact that both men had been questioned at length by the police and subsequently excluded as suspects, the State was attempting to anticipate and diffuse the matter on direct. Under the facts of this case, we do not agree that the prosecutor was attempting to improperly bolster the credibility of the witnesses by the line of questions referenced by Reynolds. Accordingly, we do not find that the prosecutor’s questions in this regard amounted to plain error. Rule 45A, Ala.R.App.P.”
114 So.3d at 105-06. As in Reynolds, we find no plain error in the prosecutor’s questions. Likewise, we find no plain error in the prosecution’s argument that was based on evidence it intended to present to the jury. “A statement based on facts admissible in evidence is proper.” Henley v. State, 361 So.2d 1148, 1151 (Ala.Crim.App.1978).
Hosch is not entitled to relief on this claim of eiTor.
X.
Hosch argues that the trial court erred in sentencing him to death. He presents four specific challenges to the trial court’s findings on aggravating circumstances and mitigating circumstances, and he argues that the trial court applied the wrong standard when weighing those circumstances. Hosch is raising all of these arguments for the first time on appeal, so we review each for plain error. Rule 45A, Ala. R.App. P.
A.
Hosch first argues that the trial court improperly used his “prior contacts” with law enforcement to give little or no weight to the statutory mitigating circumstances of age and lack of significant criminal history.
The trial court found two statutory mitigating circumstances, that is, Hosch’s age at the time of the offense, which was 21, § 13A-5-51(7), Ala.Code 1975, and that he had no significant histoi-y of prior criminal activity, § 13A-5-51(l), Ala.Code 1975. The trial court discussed Hosch’s record of adult convictions, including the crimes for which he was under a sentence of imprisonment when Willmore was murdered. The court also considered Hosch’s contacts with the court system as a juvenile and as an adult but noted, again, that Hosch had been placed on probation as an adult and ultimately sentenced to prison as it determined that each mitigating factor was due little weight. The trial court did not negate either mitigating circumstance based on Hosch’s prior contacts with law enforcement as a juvenile or an adult, ' and it assigned each factor little weight in significant part because of Hosch’s adult criminal convictions and sentences. Thus, no error occurred.
*1095 In Thompson v. State, 153 So.3d 84, 150 (Ala.Crim.App.2012), this Court stated:
“ ‘ “While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.” ’ Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989)). ‘The weight to be attached to the ... mitigating evidence is strictly within the discretion of the sentencing authority.’ Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000).”
Although a trial court may not use a juvenile record as the basis for giving little or no weight to such mitigating circumstances, Ex parte Burgess, 811 So.2d 617, 624 (Ala.2000), the trial court may properly consider that factor in the weighing process. As we said in a case presenting similar circumstances: “In light of the entire sentencing order in the present case, the trial court clearly also based its decision to accord little weight to these mitigating factors on reasons other than the juvenile adjudications that were both proper and supported by the record.” McMillan v. State, 139 So.3d 184, 210 (Ala.Crim.App.2010).
Furthermore, although Hosch correctly cites Hodges v. State, 856 So.2d 875, 892 (Ala.Crim.App.2001), aff’d, 856 So.2d 936 (Ala.2003), for the proposition that only a conviction can negate the consideration of the mitigating circumstance, the trial court did not negate or limit any mitigating circumstance based on Hosch’s prior contacts with the justice system. The trial court stated in its sentencing order: “Although he has been charged with a number of offenses throughout his short life, it appears that he has only been convicted of some traffic related offenses, possession of marijuana 2nd degree, possession of marijuana 1st degree, receiving stolen property 1st degree and harassment.” (C. 496.) Thus, the trial court mentioned Hosch’s prior contacts but clearly relied only on convictions in determining the weight due the mitigating circumstance of no significant history of prior criminal activity.
Hosch failed to demonstrate any error or plain error, and he is not entitled to relief.
B.
Hosch also argues that the trial court erred in relying on his behavior at trial as an aggravating circumstance and that it weighed this evidence against the nonstat-utory mitigating circumstances.
In support of his argument on this issue Hosch quotes two statements from the trial court’s sentencing order and one statement from the trial court’s oral pronouncement of sentence without reference to the context in which the statements appeared. Hosch cites to the trial court’s statement in the written sentencing order that Hosch, after confessing to the crime, took the stand and claimed that someone else had committed the crime. Hosch argues that the statement, and a similar statement the trial court made in court when announcing the sentence, establish that the trial court considered Hosch’s decision to testify as a nonstatutory aggravating factor. The record demonstrates otherwise. In the sentencing order and at the sentencing hearing the trial court discussed that it found three statutory aggravating circumstances: that the capital offense was committed while Hosch was engaged in the commission of a robbery, § 13A-5-49(4); that the capital offense was committed while Hosch was engaged in the commission of a burglary, § 13-A-5-49(4); and that the capital offense was *1096 committed by a person under sentence of imprisonment, § 13A-5-49(l). The trial court then stated that it placed most weight on the aggravating circumstance that the murder was committed during a robbery, and it set out the evidence that supported its decision and its evaluation of that evidence. It was in the context of this discussion that the trial court noted that Hosch had confessed to the crime then testified at trial that someone else had been responsible for the crime. Thus, it was not the fact that Hosch testified but that Hosch attempted to place the blame on someone else after having taken responsibility for it that the trial court found significant. Similarly, in pronouncing sentence orally, the trial court made the same point. The trial court’s discussion of the evidence and its explanation for its weighing process did not indicate that it found or considered this evidence to be nonstatutory aggravating circumstances. See Burgess v. State, 827 So.2d 134, 181-82 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2002). Hosch’s interpretation of the trial court’s statements is not supported by a review of the entire sentencing order or by a review of the court’s oral pronouncement of sentence.
Hosch also argues that the trial court stated that it assigned little weight to the nonstatutory mitigating evidence because Hosch displayed little emotion at trial and expressed no remorse. He claims that the trial court violated the prohibition against compulsory self-incrimination set out in the Fifth Amendment to the United States Constitution and erroneously considered this as a nonstatutory aggravating circumstance. Hosch has cited no controlling caselaw that holds that the mere mention of Hosch’s lack of remorse in the trial court’s discussion of its weighing of the nonstatutory mitigation violated the Fifth Amendment. Furthermore, the mention of the lack of remorse in the discussion of the court’s weighing of the mitigating circumstances was not error. Burgess v. State, 827 So.2d at 181-82, See also Billups v. State, 72 So.3d 122, 136 (Ala.Crim.App.2010) (trial court found that defendant’s attempt to set up false alibi witnesses diminished the weight accorded nonstatutory mitigating circumstances); Revis v. State, 101 So.3d 247, 320-21 (Ala.Crim.App.2011)(trial court mentioned defendant’s lack of remorse when discussing the weight it assigned to a statutory mitigating circumstance).
Hosch is not entitled to relief on these claims.
C.
Hosch also argues that the trial court erred when it assigned little weight to the mitigating evidence regarding his dysfunctional childhood and mental-health issues. Hosch did not raise this objection at trial, so we review it for plain error.
In the written sentencing order the trial court set out the evidence Hosch put forth as mitigation, including a detailed discussion of the following factors:
“[T]hat he was diagnosed with post-traumatic stress disorder; that he was raised in a dysfunctional family; that he was raised with no or few positive role models; that he grew up around criminals and violence; that he has been diagnosed with a developmental disorder; and that he has a problem with substance abuse.”
(C. 499.)
The trial court then stated that it considered the nonstatutory mitigating circumstances and assigned “very little weight to them,” and it explained its reasons for its decision. (C. 500-01.) Hosch argues that the trial court should have given “appropriate consideration to Mr. Hosch’s troubled and traumatic childhood as a mitigating factor.” (Hosch’s brief, at p. 77.) We disagree.
*1097 The law in Alabama clearly grants the trial court unlimited discretion in determining the weight mitigating evidence is due. In Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012), this Court stated:
“ ‘ “While Lockett [v. Ohio, 438 U.S. 586 (1978),] and its progeny require consideration' of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.” ’ Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989)). ‘The weight to be attached to the ... mitigating evidence is strictly within the discretion of the sentencing authority.’ Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000).”
“ ‘ “[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev’d on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.” ’
“Bush v. State, 695 So.2d 70, 94 (Ala. Crim.App.1995) (quoting Clisby v. State, 456 So.2d 99, 102 (Ala.Crim.App.1983)). See also Douglas v. State, 878 So.2d 1246, 1260 (Fla.2004) (‘We conclude that the trial court did not abuse its discretion in giving little weight to the mitigating facts relating to [the defendant’s] abusive childhood.’); Hines v. State, 856 N.E.2d 1275, 1282-83 (Ind.App.2006) (‘The trial court is not obliged to weigh or credit mitigating factors the way a defendant suggests.... [or] to afford any weight to [the defendant’s] childhood history as a mitigating factor in that [the defendant] never established why his past victimization led to his current behavior.’).”
Thompson v. State, 153 So.3d at 188.
No error, and certainly no plain error occurred as a result of the trial court’s weighing of the mitigating evidence.
D.
Hosch next argues that the trial court erred when it refused to find two statutory mitigating circumstances: that Hosch acted under the influence of extreme mental or emotional disturbance, § 13A-5-51(2), Ala.Code 1975, and that his capacity to appreciate the criminality of his conduct or to conform it to the requirements of the law was substantially impaired, § 13A-5-51(6), Ala.Code 1975. This argument is raised for the first time on appeal and is reviewed for plain error. Rule 45A, Ala. R.App. P.
As noted in previous sections of this opinion, the law requires that a trial court consider all evidence submitted in mitigation, but whether the proffered evidence is actually found to be mitigating is a matter for the trial court’s discretion. E.g., Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012). Hosch does not argue that the trial court failed to consider the evidence he proffered as mitigation but, rather, that it failed to find the evidence to be mitigating.
*1098 The trial court addressed mitigating circumstances and discussed the evidence submitted at the sentencing hearing. With regard to the § 13A-5-51(6) mitigating circumstance the court stated:
“[T]he Court submitted to and allowed the jury to consider the statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. This Court does not find that this factor exists. Even if it does exist, the Court assigns no weight to it.
“Dr. Bruce Atkins, a forensic psychiatrist, testified on behalf of the defendant during the penalty phase of this proceeding. Dr. Atkins opined that Hosch suffers from post-traumatic stress disorder as a result of being raised in a dysfunctional family with no positive role models. He further opined that Hosch suffers from a developmental disorder and substance abuse.
“Dr. Karl Kirkland, a clinical and forensic psychologist, performed initial forensic evaluations on Hosch at the request of this Court. When tested by Dr. Kirkland, Hosch was found to have a full scale IQ of 102. Although he dropped out of school in the tenth grade, he received a GED while in prison and reads on a seventh grade level. Further, although Hosch related to both Dr. Kirkland and Dr. Atkins that he had used cocaine, marijuana and LSD in the past there is no finding that drug use has adversely affected his ability to appreciate or understand right from wrong.
“Further, Dr. Kirkland did specific testing to determine whether Hosch was competent to waive his Miranda rights at the time that he gave his statement to law enforcement. Based upon that evaluation, Dr. Kirkland determined that Hosch does not exhibit a deficit in reasoning ability. In fact, Dr. Kirkland found that Hosch was able to use his reasoning ability to make informed decisions and that there was no evidence of intellectual deficit that would interfere with his ability to make a decision in the situation of an interview about details of the alleged offense. Additionally, Dr. Kirkland found that Hosch did not allege the existence of mental illness variables as being related in any way to his behavioral choices at the time of the alleged offense. For these reasons, this Court places no weight upon the statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. In fact, this Court finds to the contrary.”
(C. 496-98.)
The trial court also considered and addressed the § 13A-5-51(2) mitigating circumstance and stated:
“[Biased upon the evidence presented in this case, this Court finds that there is no evidence that the defendant was under the influence of extreme mental or emotional disturbance at the time that this capital offense was committed. To the contrary, it is clear that the defendant did have the ability to distinguish between right and wrong and was able to control his actions and make decisions.”
(C. 498.)
The trial court considered all the mitigating evidence presented, as it was required to do. The determination of whether the evidence established one or more mitigating circumstances was within the trial court’s discretion. We find no error, and certainly no plain error, as a result of the trial court’s exercise of its discretion in this matter. See, e.g., Ex parte Loggins, 771 So.2d 1093 (Ala.2000) (trial court con *1099 sidered evidence proffered but did not find the existence of the statutory mitigating circumstances set forth in § 13A-5-51(2) and (6), Ala.Code 1975); Reynolds v. State, 114 So.3d 61, 153-54 (Ala.Crim.App.2010)(same).
E.
Finally, Hosch argues that the tri-' al court applied the wrong standard when it sentenced him to death because it sentenced him to death based on its finding that the mitigating circumstances did not outweigh the aggravating circumstances. (C. 501.) Section 13A-5-47, Ala.Code 1975, provides that a capital defendant must be sentenced to life imprisonment without the possibility of parole unless the trial court finds that the aggravating circumstances outweigh the mitigating circumstances. Hosch did not raise this objection in the trial court, so we review it for plain error.
This issue has been raised and addressed in other capital eases:
“In addressing an identical statement in a circuit court’s sentencing order, the Alabama Supreme Court, finding the error harmless, stated:
“ ‘The trial judge sentenced the defendant to death upon a finding “that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance.” [Melson v. State,] 775 So.2d [857] at 901 [(Ala.2000)]. To support the imposition of the death penalty, the law requires that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances. See § 13A-5-47(d) and (e), Ala.Code 1975; Ex parte Jones, 456 So.2d 380, 382 (Ala.1984).
“ ‘On this point, the Court of Criminal Appeals cited Weaver v. State, 678 So.2d 260 (Ala.Crim.App.1995), rev’d on other grounds, 678 So.2d 284 (Ala. 1996), and other cases for the proposition that this defect was a “technical” defect or error, and correctly concluded that the error was harmless in this particular case, but the error should not be minimized as a mere technicality. A trial court is to impose a sentence of death only after finding that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances. But we conclude in this case, as did the Court of Criminal Appeals, that the “error in the trial court’s sentencing order was error without injury.” See 775 So.2d at 902. Certainly, the better practice would be to strictly follow the mandates of the statute when imposing death sentences.’
“Ex parte Melson, 775 So.2d 904, 907 (Ala.2000). See also Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010).
“Here, the court instructed the jury, several times, that before the jury could vote for the death penalty the aggravating circumstance must outweigh the mitigating circumstances and that the weighing process was not a numerical tallying. (R. 2676; 2696-97.) It is clear that the circuit court was aware of the appropriate legal standárd to apply when determining Boyle’s sentence. For these reasons, we find that the error in the sentencing order was error without injury.”
Boyle v. State, 154 So.3d 171, 245 (Ala.Crim.App.2013).
As in Boyle and the cases cited therein, we find no plain error in this case. The trial court repeatedly instructed the jury that, in order to recommend a death sentence, the jury had to find that the aggravating circumstances outweighed the mitigating circumstances. (R. 1627, 1793, 1801, 1803, 1804.) The trial court was clearly aware of the legal standard. We *1100 note, too, the presumption that the trial court also followed the instructions it gave to the jury. Burgess v. State, 827 So.2d 184, 182 (Ala.Crim.App.1998)(quoting Rutledge v. State, 528 So.2d 1087, 1103 (Ala. Crim.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988)).
For all the foregoing reasons, we find no plain error as to this issue.
XI.
Hosch next argues that the trial court erred by relying on an insufficient presen-tence-investigation report (“PSI”). He says that, like the PSI in Ex parte Washington, 106 So.3d 441 (Ala.2011), the report here was perfunctory and inadequate and did “virtually nothing to fulfill the report’s additional purpose of painting a picture of the convicted’s character and background.” (Hosch’s brief, at p. 84-85.) He further argues that the PSI was nearly identical to the youthful-offender-investigation report. Finally, he argues that the trial court relied on this inadequate report, and its sentencing decision was impacted because, he says, the trial court did not have adequate information about Hosch’s mental health and family history. Hosch failed to raise any objection at trial to the PSI, so all of these arguments are reviewed for plain error. Rule 45A, Ala. RApp. P.
Section 13A-5-47(b), Ala.Code 1975, requires the trial court to order and receive a PSI before it determines the sentence. We agree with Hosch that his PSI is virtually identical to his youthful-offender report, and that the PSI failed to provide detailed information about Hosch’s upbringing in his dysfunctional family, his drug use, or his mental health. Any deficiencies in the report, however, do not rise to the level of plain error or require reversal.
In Wilson v. State, 142 So.3d 732, 800 (Ala.Crim.App.2010) (opinion on return to remand), this Court addressed a similar challenge to the adequacy of a PSI, stating:
“In support of his argument, Wilson relies on Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), in which this Court reversed Guthrie’s sentence based on an insufficient presentence-investigation report. Specifically, this Court took issue with the lack of recent information in Guthrie’s personal- and social-history section of the report, and its lack of any information in Guthrie’s evaluation-of-offender section. In Guthrie, this Court held:
“ ‘This presentence report’s cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court’s consideration of the full mosaic of Guthrie’s background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b) [, Ala.Code 1975]. We find that the insufficiency of this report requires a remand for the trial court to reconsider Guthrie’s sentence with a sufficient presentence report.’
“689 So.2d at 94[7],
“In Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), this Court distinguished Guthrie, stating:
“ ‘In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie’s sentence and remanded the case for the trial court “to reconsider Guthrie’s sentence with a sufficient presentence report.’” 689 So.2d at 947....
[[Image here]]
*1101 “ ‘ “The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury’s advisory verdict is proper and if not, what the appropriate sentence should be.” Ex parte Hart, 612 So.2d 536, 539 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
“ ‘Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the “full mosaic of [Jackson’s] background and circumstances” before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie’s personal and social history contained in the report had been taken from an interview that was conducted at least five years before his sentencing hearing and no attempt had been made to update that information for purposes of the presen-tence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
“Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson’s trial, ... we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
“ ‘In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goffs and Dr. Smith’s psychological evaluations containing extensive information about Jackson’s life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not “hamstrung” into determining Jackson’s sentence without consideration of “the full mosaic” of Jackson’s background and circumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999). Therefore, we find no error, plain or otherwise, as to this claim.’
“791 So.2d at 1033-34. See also Lee v. State, 898 So.2d 790 (Ala.Crim.App.2001); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000).
“As in Jackson, the circuit court here was presented with ‘the full mosaic’ of Wilson’s background and circumstances. During the penalty phase, Wilson presented testimony from his mother, who testified at length about Wilson’s childhood, and from a childhood neighbor, who testified about Wilson’s willingness to aid her in her capacity as a disaster-relief worker. See Ex parte Washington, 106 So.3d 441, 450 (Ala.2011) (expressly refusing to hold that ‘the adequacy of the presentence report should be evaluated in isolation’). In addition, the reports that Wilson complains should have been part of the presen-tence-investigation report — the competency-exam report and the youthful-offender-investigation report — were, in fact, part of the circuit court’s file and are part of the record on appeal.
*1102 “Because Wilson presented mitigation testimony during the penalty phase and the circuit court had access to the reports that were not referenced in the presentence-investigation report, this Court holds that any inadequacy in the presentence-investigation report did not constitute plain error. Rule 45A, Ala. R.App. P.; Sharifi v. State, 993 So.2d 907, 947-49 (Ala.Crim.App.2008) (concluding there was ‘no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information’). Accordingly, this issue does not entitle Wilson to any relief.”
142 So.3d at 800. See also Riley v. State, [Ms. CR-10-0988, Aug. 30, 2013] - So.3d -, - (Ala.Crim.App.2013), quoting Wilson.
We note that, before trial, Hosch filed a motion requesting $10,000 to hire an investigator for guilt-phase and penalty-phase investigation, and the trial court granted the motion. Hosch also filed a motion seeking funds to hire a mitigation expert, and the trial court granted the motion and awarded Hosch $10,000. Hosch filed additional motions seeking an additional $17,500 for the mitigation expert, $7,500 for the investigator, and $8,000 for a forensic psychologist, and the trial court granted the requests.
Hosch presented testimony from several witnesses at the sentencing hearing. He presented evidence about the areas of the PSI that, he says, were inadequately covered, and he “painted the picture” of his character and background through the various witnesses, as detailed more fully in the initial portion of this opinion. At the sentencing hearing before the jury, Hosch presented testimony from the forensic psychiatrist, Dr. Atkins, regarding his evaluation of Hosch and his diagnosis of posttraumatic-stress disorder. Dr. Atkins testified that the posttraumatic-stress disorder was the result, in part, of Hosch’s exposure to a very volatile, dysfunctional family that was extremely chaotic. Dr. Atkins testified that Hosch’s parents’ divorce during his formative years was also a traumatic experience for Hosch. He stated that Hosch had a developmental disorder as a child and that he began abusing controlled substances in early childhood as a means of escaping the trauma associated with his family. Dr. Atkins also testified that Hosch had no positive role models to teach him the proper way to behave and grow, and his mental development was negatively impacted. Hosch’s upbringing contributed to his impaired judgment and poor impulse control, Dr. Atkins said. Hosch presented testimony from his paternal grandmother, his father, his older sisters, and a man with whom Hosch and his sisters lived for a few years after Hosch’s parents divorced, and who was, at the time of trial, an Alabama Department of Corrections inmate with an extensive criminal history. The witnesses testified about the turmoil in Hosch’s upbringing, about the negative changes in Hosch’s behavior after his parents divorced, and about his exposure to violence and drug abuse and the ways those factors influenced his behavior.
The record indicates that the trial court carefully considered evidence of Hosch’s background circumstances, his mental-health issues, and his character. Therefore, any inadequacies in the PSI did not result in plain error. Hosch is not entitled to relief on any of his allegations of error regarding the PSI.
XII.
Hosch next argues that the trial court gave an incorrect jury instruction on reasonable doubt at both phases of his trial. Specifically, he claims that the jury instruction shifted the burden of proof and *1103 undermined the presumption of innocence. Hosch failed to object to the jury instruction. While the failure to object does not preclude review for plain error, Rule 45A, Ala. R.App. P., it does weigh against any claim of prejudice.
The trial court is responsible for stating the law of the case to the jury, but the court has broad discretion in formulating the jury instructions so long as the instructions accurately reflect the law and the facts of the case.
“The entire charge must be construed as a whole. Harris v. State, 412 So.2d 1278, 1281 (Ala.Cr.App.1982). When reviewing a judge’s oral charge, ‘each statement made by a judge to the jury should be examined in light of the entire charge and ... isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial.’ United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir.1976), cert. denied, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). ‘ “The language of a charge must be given a reasonable construction, and not a strained and unreasonable one.” ’ Harris v. State, 394 So.2d 96, 100 (Ala.Cr.App.1981). ‘(F)anciful theories based on vagaries of the imagination’ should not be indulged in construing the court’s charge. Addington v. State, 16 Ala.App. 10, 19, 74 So. 846 (1916).”
Kennedy v. State, 472 So.2d 1092, 1103 (Ala.Crim.App.1984), aff'd, 472 So.2d 1106 (Ala.1985).
“So long as the definition of ‘reasonable doubt’ in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska[, 511 U.S. 1, (1994)]; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).” Knotts v. State, 686 So.2d 431, 459 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996).
Hosch finds fault with the highlighted portion of the trial court’s guilt-phase jury charge on reasonable doubt:
“As you know, a person in our country does not have to come in here and prove to you that they’re innocent. The law says that for them. And that presumption goes with everybody, Mr. Hosch here included, unless and until the State proves to you beyond a reasonable doubt each and every element necessary to constitute guilt. Facts that might warrant a suspicion are not sufficient to meet the State’s burden. Unless the State meets its burden of proof beyond a reasonable doubt, the law says that the presumption of innocence is sufficient in and of itself to authorize a finding of not guilty.
“Let’s talk about the burden of proof that’s on the State of Alabama that prove beyond a reasonable doubt each element of the offense. The term ‘reasonable doubt’ is like a lot of terms' in the law and addresses itself to your good common sense.
“A lot of times, if not almost always, your good common sense definitions of words and phrases are at least as good, if not a lot better, than some of the these definitions that we lawyers and judges use.
“What is it, a reasonable doubt? It’s simply a doubt for which you can assign a reason. A doubt for which you can assign a reason that comes from the evidence or from the lack of evidence. Another way of saying it is this[:] if after considering all of the evidence in the case you ask yourself this question, is Mr. Hosch guilty? And if the answer that freely and naturally flows back to you is I doubt that he is, and if that’s based on the evidence or the lack of *1104 evidence, then the law says that that’s the kind, of case that would entitle him to a finding of not guilty.
“On the other hand, if after asking yourself that same question, is Mr. Hosch guilty, if the answer that freely and naturally flows back to you is I have no doubt for which I can assign a reason but that he is, if that’s based on the evidence that’s been presented to you, then the law says that that’s the kind of case that would entitle the State to finding of guilty.
“You know, the State doesn’t have to prove guilt to you beyond all doubt. They don’t have to prove guilt to a mathematical certainty. But they must prove guilt beyond that doubt for which there is a reason. Not one that you would have to reach, strain or grope for, but one that freely and naturally comes back to you.
“It’s been well, I’ll read this one. The Supreme Court has said that the phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. It is not a mere possible doubt, because everything related to human affairs is open to some possible or imaginary doubt.
“A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all of the evidence in the case. It is a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but is an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence, or a combination thereof. It is a doubt that remains after going over in your mind the entire case and giving consideration to all of the testimony. It is distinguished from a doubt arising from a mere possibility, from bare imagination or from fanciful conjecture. Finally, it’s been said that proof beyond a reasonable doubt is proof of such a convincing character that you would be willing to rely and act upon it in the most important of your own affairs.
“A conviction cannot and must not be based on surmise, speculation or suspicion or guesswork, conjecture, sympathy or any of those things. It must be based on the evidence by proof beyond a reasonable doubt. The possibility that something might occur is not alone evidence, even circumstantially, that it did occur.”
(R. 1580-83.) (Emphasis added.)
Hosch correctly states that, at the penalty phase, the trial court instructed the jury to rely on the instructions from the guilt phase. However, the trial court also gave the following instruction on reasonable doubt:
“The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. It is not a mere possible doubt, because everything relating to human- affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all of the evidence in the case. It’s a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but is an actual doubt based upon the evidence, the lack of evidence, a conflict in the evidence or a combination thereof. It is a doubt that remains after going over in your mind the entire case and giving consideration to all the testimony and evidence. It’s distinguished from a doubt arising from a mere possibility, from bare imagination or from fanciful conjecture.
“If after considering all of the evidence that’s been presented to you during — in the case you are convinced of the existence of this proffered aggravating circumstance beyond a rea *1105 sonable doubt, then it would then be your duty to consider that aggravating circumstance during your sentencing deliberations. However, if you have a reasonable doubt about the aggravating circumstances, you should not consider those aggravating circumstances during your sentencing deliberations.”
(R. 1797-98.)
Nothirig in Alabama law requires a trial court to use any particular words in defining reasonable doubt, as long as the instruction, taken as a whole, correctly defines for the jury the concept of reasonable doubt. A substantial portion of the guilt-phase and sentencing-phase jury charge on reasonable doubt tracked the language of the pattern jury instruction. The trial court did not incorrectly charge the jury. The phrases regarding a determination regarding reasonable doubt that “naturally flowed” to the juror, to which Hosch now objects, were similar to the phrases in the pattern charge regarding a fair-minded juror using reason and common sense. Furthermore, the trial court repeatedly instructed the jury that its decision had to be based on evidence. The use of those phrases as part of the entire instruction that tracked much of the language of the pattern jury instruction did not lessen the burden of proof, undermine the presumption of innocence, or shift the burden of proof.
As to the portion of the instruction Hosch challenges regarding proof beyond a reasonable doubt being “proof of such a convincing character that you would be willing to rely and act upon it in the most important of your own affairs,” we find no shifting or lessening of the State’s burden of proof. In Albarran v. State, 96 So.3d 131, 190 (Ala.Crim.App.2011), the trial court instructed the jury on the burden of proof, in part, by stating: “If you would be willing to accept such evidence of that type and character in matters of the highest importance to you personally then you are so satisfied to the required degree of beyond a reasonable doubt.” We found that the instruction did not violate constitutional principles or lessen the State’s burden of proof in that case, and we reach the same conclusion here as to. Hosch’s challenge.
“Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.”
Boyde v. California, 494 U.S. 370, 381, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).
Reviewing the jury charge at each phase of the trial as a whole, we hold that the trial court’s instructions properly conveyed the concept of reasonable doubt to the jury and did not diminish the State’s burden of proof. There is no reasonable likelihood that the jury applied the instructions in a manner that lowered the State’s burden of proof or shifted the burden of proof from the State and to Hosch. Therefore, we find no error, and certainly no error rising to the level of pláin error.
XIII.
Hosch next argues that several of the jury instructions at the guilt phase of trial were erroneous and prejudicial.
The standard of review — plain error— relevant to Hosch’s challenges to the jury instructions was set out in the previous section of this opinion, and we review Hosch’s arguments in light of those principles.
A.
Hosch first argues that the trial court erred when it instructed the jury *1106 that, when evaluating Hosch’s testimony, it was naturally relevant that he was the defendant and that he had an interest in the case. He argues that the court invaded the province of the jury and that the “instruction unduly emphasized Mr. Hosch’s interest in the outcome of the case.” (Hosch’s brief, at p. 97.) Hosch did not object to the trial court’s instruction at trial, and that failure weighs against him in our plain-error review.
The trial court instructed the jury as follows:
“Now, the defendant has taken the stand in this case and testified, which he has a perfect right to do. The law says that you cannot just capriciously disregard his testimony, but naturally you can take into account that he is the defendant and, of course, he does have an interest in the outcome of your verdict.”
(R. 1604.)
One of the cases Hosch cites, Phillips v. State, 606 So.2d 170 (Ala.Crim.App.1991), supports the State’s argument that no error occurred here. Phillips argued that the trial court erred when the trial court instructed the jury that it must consider his interest in the case, and this Court stated, in relevant part, “ ‘It seems unnecessary to again say, what we have so many times already said: i.e., that the rule is that the jury may consider defendant’s testimony in the light of his interest, etc., not that they must.’ Miller v. State, 21 Ala.App. 283,107 So. 721, 722 (1926).” 606 So.2d at 170. The trial court here did not instruct the jury that it must consider Hosch’s interest in the outcome of the case. The instruction did not invade the province of the jury, see Reynolds v. State, 114 So.3d 61, 149-50 (Ala.Crim.App.2010), or unduly emphasize Hosch’s interest in the outcome of the case. No error occurred, and certainly no error rising to the level of plain error.
B.
Hosch next argues that the trial court’s instruction on witness credibility invaded the province of the jury. Hosch raises this argument for the first time, and we review it for plain error. Rule 45A, Ala. R.App. P. No error — plain or otherwise — occurred.
The trial court instructed the jurors that they were to determine the weight and credibility to place on a witness’s testimony and further instructed jurors about resolving conflicts in the evidence or the testimony. The trial court then stated:
“Let me give you some things to look to in helping you determine the weight and credibility that you wish to place on a particular witness’s testimony. First of all, you want to look to see whether or not that witness had any particular or special interest or bias or prejudice in the case. Did the witness actually have the ability to hear, see or know what they told you? What was the witness’s demeanor? Were they easy or uneasy, willing or unwilling? Demeanor is one of those big words that we use to describe something that you and I observe every day as we go through our lives. You know how when you meet and talk to somebody, you just get a good gut feeling from looking at them and talking to them as to whether they’re shooting you straight. The same thing applies here.
“Contrary to popular opinion sometimes, the Courtroom is not one of those places where you leave your good common sense outside. 14 of you have heard the evidence in the case. In just a little bit 12 of you will go back to the jury room and decide it. Different folks with different backgrounds and different experiences in life. I expect you to, and I know that you will, use your good common sense as you evaluate the testimony *1107 and the evidence and determine the weight and credibility that you want to place on it.”
(R. 1599-1600.)
Hosch objects now to the part of the instruction that referred to a “gut feeling,” and he asserts that the trial court was instructing the jury that its verdict should rely on the gut feeling of Hosch’s guilt and that the instruction invaded the province of the jury and decreased the State’s burden of proof.
Hosch misinterprets the trial court’s instruction, which was nothing more than an instruction to the jurors that they use their common sense and reason as one factor in evaluating a witness’s credibility. The trial court has substantial discretion in formulating the jury instructions so long as they accurately reflect the law and the facts of the case, and the court’s charge, as a whole, must be considered when reviewing challenges to any portion of the charge. E.g., Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013). Nothing in this jury charge can reasonably be interpreted as invading the jury’s role to make credibility determinations. Nothing in the jury charge can reasonably be interpreted as lessening the State’s burden to prove Hosch’s guilt beyond a reasonable doubt. The jury charge, as a whole, accurately informed the jury of its responsibility to make determinations of credibility and weight.
Hosch is not entitled to relief on this claim of error.
C.
Hosch next argues that the trial court erred when it instructed the jury that the court had made a preliminary determination of the voluntariness of Hosch’s statement and had admitted Hosch’s statement. He states that it is improper for a trial judge to disclose to the jury that the judge has determined that a confession was voluntary. Hosch did not object to this jury instruction at trial, so our review is for plain error. Rule 45A, Ala. R.App. P.
The jury was instructed as follows:
“The defendant’s statement has been admitted into evidence in this case for you to consider. The Court was called upon and made a preliminary determination and admitted the statement into evidence. You are to make a determination of the voluntariness of that statement as affecting the weight and credibility to be given to it.”
(R. 1604.)
“It is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible.” Ex parte Singleton, 465 So.2d 443, 446 (Ala. 1985). The trial court here did not disclose that it had made a preliminary determination that Hosch’s statement was voluntary. The court stated only that it had made a preliminary determination and had admitted the statement. The only mention of voluntariness was in the court’s instruction that the jury would determine the voluntariness, the weight, and the credibility of the statement. For this reason, alone, no finding of plain error is warranted.
Furthermore, Ex parte Singleton supports our determination that a reversal on this basis is not due. Even though the trial judge in Ex parte Singleton instructed the jury that it had decided that Singleton’s statement was voluntary, the conviction was not reversed because, the Alabama Supreme Court explained:
“[T]he trial judge made it clear to the jury that they were to ultimately determine whether the confession was voluntary. We agree, therefore, with the Court of Criminal Appeals that there was no prejudicial error, since the com *1108 ments of the trial judge ‘did not imply that the jury should accept and believe appellant’s confession based on the trial court’s ruling that the statement was voluntary.’ ”

Id.

The Alabama Supreme Court in Ex parte Singleton set out the law with respect to the issue of voluntariness:
“Correctly stated, whether a confession was voluntary rests initially with the trial court; once the trial judge makes - the preliminary determination that the confession was voluntary, it then becomes admissible into evidence. Thereafter, the jury makes a determination of voluntariness as affecting the weight and credibility to be given the confession”
Id. (Emphasis added.) The trial court here instructed the jury that it was “to make a determination of the voluntariness of that statement as affecting the weight and credibility to be given to it.” (R. 1604.)(Emphasis added.)
The trial court’s instruction did not result in any error, and certainly not plain error requiring reversal.
D.
Hosch argues that the trial court limited the jury’s consideration of lesser-included offenses in several ways.
1. First, Hosch argues that the trial court, erred when, before the attorneys gave their opening arguments, it instructed the jury about the four counts of the indictment without also instructing the jury about lesser-included offenses for the capital-murder charges. Hosch did not object at trial, so we review this argument for plain error.
Hosch cites no legal authority for the proposition that a trial court must instruct a jury on lesser-included offenses before any evidence is presented, and our research has revealed none. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), cited by Hosch, held unconstitutional the Alabama statute that precluded instructions on lesser-included offenses supported by the evidence in capital cases and is inapposite because the current statute does not preclude instructions on lesser-included offenses. Until the evidence was presented, however, there was no way for the trial court to determine whether Hosch was entitled to an instruction on any lesser-included offense. When the trial court charged the jury at the conclusion of the guilt phase, it instructed the jury on lesser-included offenses supported by the evidence. Hosch received the process he was due, and no error or plain error occurred.
2. Hosch next argues that the trial court erred when it in instructed the jury to first consider the charge in the indictment and to consider lesser-included offenses if it found the charged offense was not proven. Hosch did not raise this objection at trial, so we conduct a plain-error review. The argument Hosch raises here has been considered and rejected. Lee v. State, 898 So.2d 790, 839 (Ala.Crim.App.2001). Therefore, we find that there was no plain error, and that Hosch is not entitled to relief.
3. Hosch next argues that the trial court erred when, in response to the jury’s request for a description of the charges and the elements of the capital-murder charges, it instructed the jury only on the capital offenses and not on the lesser-included offense of felony murder. Hosch raised a timely objection at trial to this alleged error.
In response to the júry’s question, the trial court first instructed the jurors that it would answer the question as directly as possible without repeating the entire charge, but that the jury was not to put any more weight on what the court said in *1109 the supplemental instruction because the jury was to give equal consideration to the entire jury charge. (R. 1613.) The court then charged the jury on robbery-murder and said that if the State failed to prove the elements beyond a reasonable doubt, the jury then “would consider each of the lesser-included offenses as I have explained that to you and as listed on your verdict form.” (R. 1616-17.) The trial court then instructed the jury on burglary-murder, and told the jury that if it found that the State had not met its burden of proof, it would then consider the lesser-included offenses on which the court had instructed earlier. (R. 1618.)
When a jury requests additional instructions, it is recommended that the trial court answer the specific inquiry and not repeat any other part of the instructions. E.g., Belisle v. State, 11 So.3d 256, 309-310 (Ala.Crim.App.2007), and cases cited therein, aff'd, 11 So.3d 323 (Ala.2008). It is assumed that the jury will consider the instructions given in the initial charge along with the supplemental instructions. Id. In this case, the trial court specifically instructed the jury that it was to consider the instructions in the initial charge and that those instructions had equal weight with the supplemental instructions. Moreover, the trial court twice instructed the jury in the supplemental charge that it should consider the lesser-included offenses if it found that the State had not sustained its burden of proof as to the capital charges. No error occurred.
XIV.
Hosch next argues that the trial court made numerous errors at the penalty phase that require reversal of his death sentence. We consider each argument in turn.
A.
Hosch argues that the trial court erred when it prohibited him from relying on mercy as a mitigating circumstance and when it refused to instruct the jury on mercy as a mitigating circumstance. He further argues that the trial court’s rulings on this evidence unlawfully prevented the jury from considering all the mitigating evidence he intended to offer.
The State filed a motion in limine in which it requested that the trial court prohibit improper arguments for mercy at the sentencing phase of the trial. The trial court considered the arguments of the parties at a pretrial hearing, and it granted the motion. Our review of the record does not indicate that Hosch ever attempted to argue for mercy and was denied the opportunity, so our review of this portion of the claim is for plain error. Rule 45A, Ala. R.App. P. We note, moreover, that defense counsel asked the jury in his sentencing-phase closing argument to temper justice with “compassion for somebody who fell through the cracks and never really had a chance.” (R. 1777.)
The sentencer may not be precluded from considering any mitigating circumstances offered by the capital defendant.
“[M]itigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.”
§ 13A-5-52, Ala. Code 1975.
“Mercy” is not a mitigating circumstance under Alabama law. Moreover, contrary to the argument Hosch made in the trial court (R. 192), “[t]here is no constitutional requirement that a capital defendant be allowed to ask a jury for mer *1110 cy,” Dotch v. State, 67 So.3d 936, 998 (Ala.Crim.App.2010).
Furthermore,
“ ‘Alabama courts have held that capital defendants are not entitled to jury instructions on mercy and residual doubt.’ Burgess v. State, 723 So.2d 742, 769 (Ala.Crim.App.1997). ‘[A] juror may not arbitrarily consider mercy when deciding whether a defendant should be sentenced to death or life imprisonment without the possibility of parole.’ Blackmon v. State, 7 So.3d 397, 438 (Ala.Crim.App.2005). Because Albarran was not entitled to a jury instruction on mercy, McMillan v. State, 139 So.3d 184, 210 (Ala.Crim.App.2010), no error, much less plain error, resulted from the circuit court’s failure to give such an instruction.”
Albarran v. State, 96 So.3d 131, 210-11 (Ala.Crim.App.2011).
No error or plain error occurred when the trial court granted the State’s motion in limine to prevent Hosch from making arguments for mercy at the penalty phase. No error occurred when the trial court refused to instruct the jury on mercy.as a mitigating circumstance.
B.
Hosch argues that the trial court erred when it refused to give defense counsel’s requested jury instruction that a mitigating circumstance did not have to be found to exist unanimously before it could be considered. He also argues that, because the trial court’s jury instruction referred to the jury as one unit, by using “you” and “your,” in the jury charge on mitigating evidence, it misled the jury and violated Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). “The United States Supreme Court in Mills v. Maryland held that if there was a substantial probability that a jury instruction in the penalty phase of a capital trial implied that a finding on a mitigating circumstance must be unanimous the death sentence must be vacated.” Calhoun v. State, 932 So.2d 923, 972 (Ala.Crim.App.2005).
First, the trial court’s jury instructions on mitigating evidence were substantially identical to the Pattern Jury Instructions for Use in Capital Cases.
Second, the issue Hosch raises here has been considered and rejected.
“As we stated in Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000):
“ ‘The appellate courts of this state have consistently held, since the United States Supreme Court’s decision in Mills, that as long as there is no “reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances,” there is no error in the trial court’s instruction on mitigating circumstances.’
“784 So.2d at 351.
“We have carefully reviewed the circuit court’s jury instruction on mitigating circumstances and find no likelihood that the jury would have believed that its finding as to the existence of mitigating circumstances had to be unanimous. In fact, the instructions were similar to the pattern jury instructions. See Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000).”
Calhoun v. State, 932 So.2d at 972. See Ex parte Martin, 548 So.2d 496, 499 (Ala.1989).
Hosch is not entitled to relief on this claim, because no error resulted from the court’s instructions to the jury.
*1111 c.
Hosch argues that the trial court erred to reversal when it prohibited Hosch’s paternal grandmother, Peggy Adams, from testifying about the circumstances of Hosch’s parents’ divorce, the difficult living conditions Hosch experienced following the divorce, and the impact these experiences had on him.
The admission of evidence at a capital-sentencing hearing is a matter for the trial court’s sound discretion. E.g., Ex parte Peralta, 897 So.2d 1227, 1231 (Ala.2004). Hearsay evidence that is probative and relevant is admissible at a sentencing hearing. § 13A-5-45(d), Ala.Code 1975.
Adams said that she rarely saw Hosch in the 10 years after his parents divorced in 1998. However, Adams was permitted to testify that she noticed a “definite change” in Hosch after his parents divorced, that the divorce had a negative impact on him, and that he got into trouble afterward. (R. 1694-95.) She also testified that she was told that Hosch stayed in the family home by himself at times after the divorce. (R. 1691.) Thus, Adams was permitted to testify about matters that had at least minimal relevance and probative value. That Adams was not permitted to testify about the reasons for the divorce did not constitute an abuse of discretion because her testimony on that matter had no relevance or probative value. Moreover, Hosch’s father testified about the reasons he and Hosch’s mother divorced (R. 1700-01), so if the trial court had erred in prohibiting the testimony, any error would have been rendered harmless. McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2001), aff'd, 887 So.2d 998 (Ala.2004).
The trial court’s limitation on Adams’s testimony did not result in reversible error.
D.
Hosch next argues that the trial court erred when it refused to give his proposed instruction that evidence of his traumatic childhood and abandonment by his family could be considered as mitigating evidence.
A trial court is not required to list the specific nonstatutory mitigating circumstances provided by a defendant. E.g., Albarran v. State, 96 So.3d 131, 206 (Ala.Crim.App.2011). The trial court instructed the jury that it could consider any aspect of Hosch’s character, his record, or the circumstances of the crime as mitigation.
Furthermore, Hosch’s argument is not supported by the record because the trial court instructed the jury as follows:
“Mitigating circumstances shall also include any aspect of the defendant’s character or record or any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death. And any other relevant mitigating circumstance that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, such as, he was diagnosed with posttraumatic stress disorder; he was raised in a dysfunctional family; he was raised with no or few positive role models; he grew up around criminals and violence; he was diagnosed with a developmental disorder; and/or he had a problem with substance abuse.”
(R. 1799.)
E.
Hosch argues that the trial court erred in “double counting” robbery and burglary as aggravating circumstances. Hosch did not raise this argument in the trial court, so we review for plain error. We find no plain error, because this argument has been resoundingly rejected.
*1112 “The ‘double counting’ of burglary, robbery, and kidnapping as aggravating circumstances is provided for in Alabama’s death-penalty statutory scheme. § 13A-5-45(e), Ala.Code 1975. ‘Double counting' has been upheld in the United States Supreme Court, Lowenfield v. Phelps, 484 U.S. 231, 244-45, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), and in our appellate courts, e.g., Ferguson v. State, 814 So.2d 925, 956-57 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), and cases cited therein.”
Deardorff v. State, 6 So.3d 1205, 1232 (Ala.Crim.App.2004), aff'd, 6 So.3d 1235 (Ala.2008).
F.
Hosch next argues that the trial court and the prosecutor misled the jury as to its role because the court and the prosecutor referred to the jury’s verdict as “advisory” and a “recommendation.” Hosch did not raise this issue prior to this appeal, so we review for plain error. Rule 45A, Ala. R.App. P. This argument has been rejected, because the provisions of the relevant statute, § 13A-5-47(a) and (e), Ala.Code 1975, grant the trial judge sentencing authority and provide that the jury’s verdict is an advisory one. See Jackson v. State, [Ms. CR-07-1208, March 29, 2013] — So.3d -, - (Ala.Crim.App.2013), and cases quoted therein.
XV.
Hosch argues that the trial court committed several reversible errors during the guilt phase of his trial. We address the specific arguments below.
A.
Hosch first argues that the trial court erred when it limited his right to present a defense by precluding him from introducing evidence regarding the alleged reasons for his prison escape.
The State filed a motion in limine requesting that the trial court enter an order prohibiting Hosch from attempting to introduce any evidence or testimony regarding the details of his reasons for his prison escape. (C. 322.) At the hearing on the motion, Hosch said that the State would present evidence that he had escaped from prison, and, he argued: “It hardly seems equitable to restrict us from addressing why he escaped if there is a reason and if we are able to proffer testimony as to why he escaped.” (R. 193-93.) The trial court responded:
“And the answer is when I have his trial in Elmore County on escape that may certainly be relevant and material, but it’s not relevant and material to what the case that we’re here about is. So the motion will be granted on that issue. And there are limited instances, such as coercion and those type things that are just down the road if I have to cross that bridge, that may be relevant in the trial of the escape case.”
(R. 194.)
After the trial court ruled on other motions in limine at the hearing, the trial court stated that all of its rulings on the motions were “subject to revisiting should the course of the trial make them relevant,” and defense counsel stated that he understood that. (R. 198.)
In spite of the ruling on the motion in limine, Hosch testified that he escaped from prison because the guards beat him up every day, and, when he told the warden about the beatings, the warden told him he would have “to deal with it.” (R. 1496.) Hosch now argues that the trial court prohibited him from presenting evidence corroborating his testimony. This specific claim was not raised in the trial court. Hosch also did not present any corroborating testimony to the trial court in an offer of proof, so he did not obtain an *1113 adverse ruling from the trial court. If this were not a capital case, we would hold that the argument was not preserved for review. E.g., Bowles v. State, 784 So.2d 1077, 1079 (Ala.Crim.App.2000). However, we review the argument now for plain error. Nothing in the record supports Hosch’s current argument that the trial court prohibited him from presenting corroborating evidence. The record is silent on this matter, and will not support a finding of plain error. Ex parte Walker, 972 So.2d 737 (Ala.2007).
B.
Hosch argues that the trial court erred when it admitted testimony from three witnesses who said that they had previously identified Hosch out of court. The witnesses had been unable to identify Hosch in the courtroom, so the trial court permitted the State to present photographic lineups that had been shown to the witnesses, and permitted the witnesses to testify that they had identified Hosch when they viewed the lineups. Hosch contends that the photographic arrays were inadmissible because they contained his mug shot and were more prejudicial than probative.
As we have noted earlier in this opinion, the trial court has substantial discretion in ruling on the admissibility of evidence. E.g., Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). The trial court properly exercised that substantial discretion here, and we find no abuse of discretion.
Before trial the State gave notice of. its intent to introduce the photographic lineups into evidence, and Hosch objected on the ground that they were “overly prejudicial” and contained his mug shot. (R. 236-37.) The trial court sustained Hosch’s objection and ruled that the evidence was not admissible “[u]nless for some reason you need it for the purpose of refreshing somebody’s recollection.” (R. 240.)
Three witnesses who had identified Hosch from photographic lineups during the investigation were unable to identify Hosch in court, so the trial court permitted the State to present evidence that the witnesses had previously identified Hosch in a photographic lineup soon after the crimes occurred. The trial court explained the reason for its ruling after the first of the three witnesses, Terry Ingram, had been unable to identify Hosch in court:
“I had issued a previous ruling on this matter, but based on the testimony of Mr. Ingram the Court found that it made it relevant that the State be allowed to introduce this photo lineup through him both as a means of refreshing his recollection that he had identified the person that came to him and based on that short period of time that passed that he did that.
“The Exhibit 181 itself is not overly suggestive. Mr. Ingram testified that no one was suggested to him. I’ve reviewed the lineup. As far as photo lineups go, that’s the way it’s supposed to be done, it appears to me. The Court finds that the probative value outweighs any prejudicial effect that it might otherwise have against the defendant and that’s why I admitted State’s Exhibit 181.”
(R. 668-69.) The same process occurred with two other witnesses.
Although mug-shot photographs are not generally admissible, they may be admitted if three conditions are met: first, the State must have a demonstrable need to introduce the photographs; second, the photographs must not imply that the defendant has a prior criminal record; and third, the photographs must not be presented to the jury in such a way as to call attention to the fact that they are, in fact, mug shots. Ex parte Long, 600 So.2d 982, 989 (Ala.1992), relying on United States v. Harrington, 490 F.2d 487 (2nd Cir.1973), *1114 which held that the introduction of a mug shot that satisfied the three requisites does not result in reversible error. Even if one or more of the three requirements is not met, however, reversal is not automatic, because the error might be found harmless. Id.
The trial court correctly determined that the three requirements were met in this case. The witnesses were unable to identify Hosch in court, two years after they had identified him during the investigation, so the State needed to introduce the photographs to refresh their memory. Neither the photographs nor the manner in which they were presented at trial called attention to the fact that Hosch had a criminal history.[7] The trial court did not abuse its substantial discretion when it admitted the lineups into evidence.
C.
Hosch argues that the trial court erred when it permitted Phyllis Rollan, a section chief at the Alabama Department of Forensic Sciences (“DFS”), to testify about reports of DNA analysis that had been prepared by other analysts. Hosch objected to Rollan testifying from the reports.
Rollan testified that she is the section chief in the forensic-biology division; that the division employs a team approach in the analysis of evidence submitted in each case, and that more than one analyst works on every case; that the analysts who work on the case must agree on the results before a report is generated; that she supervises the process in each case and is responsible for all reports provided by the division. Rollan further testified that the laboratory is independent from the prosecutor’s office, and the forensic scientists work on case evidence submitted by anyone involved in a criminal case. She further stated that she had worked on cases in which persons had been excluded as perpetrators. Rollan testified that two teams at DFS tested several items of evidence from the capital-murder case and the Clifton burglary case and compared them to the DNA samples they had been provided. Hosch’s DNA matched the DNA from a t-shirt left at the scene of the burglary, she said.
Contrary to Hosch’s arguments, the trial court did not abuse its discretion when it admitted Rollan’s testimony or the forensic reports. This Court has previously held that admission of the report and testimony in these circumstances does not violate either the Confrontation Clause or any United States Supreme Court precedent. Ware v. State, [Ms. CR-08-1177, March 25, 2011] — So.3d - (Ala.Crim.App. 2011).
Moreover, the only testimony about DNA that implicated Hosch that Rollan provided was that Hosch’s DNA was found on the t-shirt recovered in the Clifton burglary.[8] Hosch never denied that he burglarized Clifton’s house and left the shirt behind, so even if any error had occurred, that error would have been harmless.
D.
Hosch argues that the trial court errad when it admitted into evidence several photographs of the victim taken at the crime scene and during Willmore’s autopsy. He argues that they were inflammato *1115 ry and prejudicial and that they were unaccompanied by a cautionary instruction to the jury.
A trial court has substantial discretion in ruling on the admissibility of evidence. E.g., Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). Hosch filed a motion in limine in which he sought an order prohibiting the State from admitting crime-scene and autopsy photographs. The trial court examined the photographs and considered arguments presented by the parties. The trial court determined that the photographs were admissible. The trial court properly exercised its substantial discretion here, and we find no abuse. In Stanley v. State, 143 So.3d 230 (Ala.Crim.App.2011), aff'd on return to remand, — So.3d -, vacated by order on other grounds and remanded, Ex parte Stanley (No. 1110298, April 17, 2012), this Court stated:
“Alabama courts have recognized that photographs depicting the crime scene and the wounds of the victims are relevant and admissible. See Stallworth v. State, 868 So.2d [1128] at 1151 [(Ala.Crim.App.2001)] (quoting Land v. State, 678 So.2d 201, 207 (Ala.Crim.App.1995)) (‘ “The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim’s wounds are admissible despite the fact that they may be gruesome or cumulative.” ’). See also Miller v. State, 63 So.3d.676, 704-705 (Ala.Crim.App.2010) (applying law on autopsy photographs to crime-scene photographs); Vanpelt [v. State], 74 So.3d [32,] 80 [(Ala.Crim.App.2009)] (same); Hyde [v. State], 13 So.3d [997,] 1016 [(Ala.Crim.App.2007)] (same).” *1116 “We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala.1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
*1115 143 So.3d at 274.
We have reviewed the photographs to which Hosch objects. A majority of the photographs depict the crime scene and the victim’s body when it was found. A few of the photographs depict the autopsy, including the entry and exit wounds to the victim’s head, and a probe indicating the path of the bullet through the victim’s head. Witnesses testified that these photographs were accurate depictions of the scene and the injuries, and the trial court acted well within its discretion when it admitted them into evidence.
Hosch also argues that the trial court erred when it declined to give a cautionary instruction before the photographs were displayed to the jury. He submitted a written proposed instruction along with his request to the court. Hosch cites no Alabama law requiring such an instruction. Moreover, a trial court has substantial discretion in formulating the jury instructions so long as they accurately reflect the law and the facts of the case. E.g., Boyle v. State, 154 So.3d 171 (Ala.Crim.App.2013). The trial court fully instructed the jury that its decision was to be based on evidence presented in court and on the law provided, and should not be based on factors such as speculation, suspicion, conjecture, or sympathy.
The trial court did not abuse its discretion when it admitted the photographs or when it declined to give the proposed instruction before the photographs were shown to the jury.
E.
Hosch next argues that the State failed to prove a complete chain of custody for the murder weapon and for the DNA swabs taken from the murder weapon. He failed to raise either of these objections in the trial court, so we review them now for plain error.
In Ex parte Holton, 590 So.2d 918 (Ala.1991), the Alabama Supreme Court established the standards to be followed when reviewing whether a proper chain of custody was established:
*1116 “The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
“If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a ‘missing’ link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a “weak’ link. When the link is ‘weak,’ a question of credibility and weight is presented, not one of admissibility.”
590 So.2d at 919-20.
Testimony established the chain of custody for the murder weapon and the swabs taken from it. Investigator Matt Thorn-bury with the Huntsville District Attorney’s Office testified that he encountered Julius Morris on October 21, 2008, and took from him the SI firearm that was later determined to be the murder weapon. He secured it in the police evidence locker until December 10, 2008, when Investigator Charlie Gray with the Huntsville Police Department took possession of the weapon. Investigator Gray gave the weapon to Investigator Lisa Hamilton with the Huntsville Police Department the following day. Investigator Hamilton testified that she took swabs from the SI firearm, then packaged the firearm and the swabs. She took the firearm and the swabs to DFS on January 14, 2009. Nancie Jones testified that she tested the swabs submitted by Investigator Hamilton. Michael Johnson testified that he was a crime-scene investigator with the Huntsville Police Department in March 2009 and that he picked up the evidence from DFS on March 27, 2009. The evidence was kept in the locked evidence room until he turned it over to Investigator Gray on June 8, 2009. Gray returned the SI weapon to Thornbury on June 8, 2009, and Thornbury placed it in the secure evidence locker. Investigator Hamilton testified that she received the firearm and swabs from Thornbury another time, on June 30, 2010. She met with officials from Autauga County on June 30, 2010, and released the property to them. Chief Sedinger testified that he received the items from Investigator Hamilton on June 30, 2010; he took the firearm to DFS *1117 on July 1, 2010. Testimony from Adam Grooms with DFS established that he returned the SI weapon to Chief Sedinger on August 5, 2010. Chief Sedinger testified that he kept the items in his custody and control thereafter.
Hosch contends that there was no testimony about who took the SI firearm to DFS in 2009, but he is incorrect because Investigator Hamilton testified that she did. Although he correctly states that there was no testimony about who received the evidence from Investigator Hamilton or about how the evidence was safeguarded while there, nothing in the record indicates that the items were tampered with or altered while they were in the custody of DFS, and Hosch has not alleged or shown any tampering, improper handling, or bad faith on the part of anyone at DFS. The witnesses testified that the items were sealed and marked during the transfers and that they did not appear to have been altered. We find that, at most, there existed weak links in the chain of custody. Weak links can affect the weight and credibility of the evidence, but they do not render the evidence inadmissible. The Alabama Supreme Court considered a case with' similar circumstances and held that the absence of testimony regarding the DFS employee who received certain items of evidence and whether those items remained secure at DFS until they were tested did not rise to the level of plain error. Ex parte Mills, 62 So.3d 574 (Ala.2010). As the Alabama, Supreme Court held in Ex parte Mills, we hold that Hosch has not established that any plain error occurred as to the chain of custody, and he is not entitled to a reversal on the basis of that claim.
F.
In the last claim of error in this part of his brief Hosch argues that the trial court erred when it denied his motion for a change of venue based on pretrial publicity. Hosch argued the motion during a pretrial hearing, and the trial court denied the motion but stated that the issues regarding juror bias and pretrial publicity would be reviewed again. After the jury was selected, the trial court asked Hosch whether he had any additional argument. Hosch stated:
“Judge, the only thing I would argue very briefly was clearly over half of the remaining at the time when that question was asked were aware of this. My understanding their answers say that there was no actual prejudice to be shown, but I think there is certainly a presumption when over one half of our jury panel is aware of the case or at least some stage or portion of the case. So we would ask that that motion be granted.”
(R. 534.) The trial court denied the motion for a change of venue.
Hosch argues that the pretrial publicity was extensive and prejudicial and that it included his mug shot amidst descriptions of the victim as a well liked member of the community.
“The Supreme Court of the United States has held that if an accused can not obtain an impartial jury in the district where he is being tried then the court should transfer the case to another district where the jurors are free of bias. Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). This guarantee has also been codified in this state in Ala.Code 1975, § 15-2-20. Rule 10.1, [Ala.]R.Cr.P. is to the same effect.”
Hunt v. State, 642 So.2d 999, 1042 (Ala. Crim.App.1993).
A trial court is in the best position to determine whether to grant a motion for a change of venue because it can assess whether the pretrial publicity and any alleged community bias will make it difficult for the defendant to receive a *1118 fair trial. Scott v. State, [Ms. CR-08-1747, Oct. 5, 2012] — So.3d -, - (Ala.Crim.App.2012). A defendant seeking a change of venue has the burden of establishing either actual prejudice or presumed prejudice. Actual prejudice exists when one or more jurors indicated before trial that they believed the defendant was guilty, and they could not set aside their opinions and decide the case based on the evidence presented at trial. Id. at - (quoting Hunt v. State, 642 So.2d at 1042-44, quoting, in turn, Coleman v. Zant, 708 F.2d 541, 544 (11th Cir.1983)). Hosch’s argument at trial and on appeal alleges presumed prejudice. Our review of the argument is governed by the following principles:
“This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Pi’ejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely’ applicable, and is reserved for only ‘extreme situations.’ Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.”
Hunt v. State, 642 So.2d at 1043.
Hosch failed to establish that the media coverage of the crime and his trial was inflammatory and prejudicial and was so extensive that it saturated the community. We have reviewed the evidence Hosch submitted to the trial court on this issue, and we conclude that the media coverage overall was objective and factual and was not inflammatory or sensational. This was not one of the extreme situations in which the media so saturated the community with prejudicial, inflammatory coverage that prejudice would be presumed. See Riley v. State, [Ms. CR-10-0988, Aug. 30, 2013] -So.3d - (Ala.Crim.App.2013). The trial court did not abuse its discretion when it denied the motion for a change of venue.
XVI.
Hosch next argues that the prosecutor’s opening argument improperly shifted the burden of proof. Specifically, he argues that the prosecutor improperly argued to the jury that it should not believe his defense that Julius Morris came to the area because, she said, “they have no evidence” that Morris was in the area. (R. 581.) Hosch did not object to the prosecutor’s argument. His failure to object does not preclude our review for plain error, but it weighs against any claim of prejudice.
The trial court repeatedly instructed the jury that the attorneys’ arguments were not evidence in the case. A jury is presumed to follow a trial court’s instructions. Sneed v. State, 1 So.3d 104, 138 (Ala.Crim.App.2007). We stated in Sneed
“ ‘ “During closing argument, the prosecutor, as well as defense counsel, *1119 has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.” Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). “In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,” Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). “In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.” Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). “To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.” Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).’
“Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).”
Sneed, 1 So.3d at 139. The relevant question when reviewing a prosecutor’s argument is whether it “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
In her opening argument, the prosecutor anticipated that the jury would have questions, such as why Willmore’s truck was not located, and she anticipated some arguments the defendant would make in order to attack the State’s case and she responded to those anticipated questions and arguments. In making her argument, the prosecutor urged the jury to remain focused on the evidence and the elements of the crime (R. 579-81), which the prosecution is permitted to do in its arguments to the jury. Minor v. State, 914 So.2d 372, 422-25 (Ala.Crim.App.2004). It was in this context that the prosecutor stated:
“You’re going to want to know where [the truck] is today. Proving to you where it is today is not an element of the offense. Please don’t let the defense tactics of trying to say things like that or trying to say that Boss came down here when they have no evidence that Boss was here, when Boss is not on any cameras, he’s not on anything down here. Don’t let those things distract you from the overwhelming evidence that you will be given throughout the course of this trial.”
(R. 581.)
Viewed as a whole, the prosecutor’s opening argument conveyed the message that the jury was to decide the case based on the evidence and determine whether the State had proved the elements of the crimes beyond a reasonable doubt. The argument did not veer outside the bounds of permissible comment, and it did not influence the jury or so infect the trial with unfairness that the conviction must be reversed. No error, much less plain error, occurred, and Hosch is not entitled to any relief.
*1120 XVII.
Hosch argues that he was denied a fair trial because the jury viewed videotapes of him in an orange jumpsuit, handcuffs, and belly restraints but was not told that it could not consider these as substantive evidence of guilt. Hosch raises this argument for the first time on appeal, so we review for plain error. Rule 45A, Ala. R.App. P.
Hosch has cited no controlling legal authority for the proposition that reversible error occurred as a result of the jury seeing him in the videotapes of his custodial interrogations in restraints and wearing an orange jumpsuit. Moreover, Alabama law is to the contrary. Shackling or handcuffing a defendant during trial tends to negate the presumption of innocence and is generally prohibited absent special circumstances. Holbrook v. Flynn, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). “However, we have not extended the violation of the presumption of innocence to the viewing of the defendant on a videotape while he is in handcuffs.” Dosier v. State, 72 So.3d 50 (Ala.Crim.App.2010).
Our discussion in another case in which the appellant argued for reversal because the jury saw him in handcuffs in a videotape is apropos:
“[T]he defense did not object to the admission of the videotape on this ground or ask for a cautionary instruction; the viewing was on television rather than in person; and the appellant did not wear handcuffs or shackles during the actual trial. Finally, the appellant had been arrested on an outstanding warrant and not on the capital murder charge at the time he made his statement. Therefore, under the facts of this case, we do not conclude that there was any plain error in this regard.”
Barber v. State, 952 So.2d 393, 446 (Ala.Crim.App.2005).
Hosch was not in restraints during the trial; the restraints were viewed on a television screen; Hosch did not object on this ground or ask for a cautionary instruction; and Hosch- had been arrested for escaping from prison, not for capital murder at the time he made the statements. As in Barber, we find no plain error here. Finally, we note that, because Hosch had escaped from prison several days before he was questioned, we would not find fault with the investigating officers’ determination of the need to keep Hosch in restraints during questioning.
For all the foregoing reasons, we find that no error occurred, and certainly no error rising to the level of plain error. Hosch is not entitled to relief on this argument.
XVIII.
Hosch next argues that Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), mandates reversal of his death sentence. Specifically, he argues that, in violation of Ring, the jury did not unanimously determine the existence of the aggravating circumstances or determine that the aggravating circumstances outweighed the mitigating circumstances, and that the jury was misinformed of its role at sentencing. Hosch’s arguments were addressed in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), a point Hosch seems to concede. He argues, nonetheless, “that Ring invalidates critical aspects of Alabama’s capital sentencing scheme.” (Hosch’s brief, at p. 126.) Although Hosch argues that Ex parte Waldrop was wrongly decided, we are bound by the decisions of the Alabama Supreme Court. § 12-3-16, Ala.Code 1975.
XIX.
Hosch argues that Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 *1121 (2005), a decision prohibiting execution of defendants who were under the age of 18 years at the time of the crime, “applies with equal force to Mr. Hosch who was 20 at the time of the offense, particularly given unrebutted evidence that his traumatic childhood and early substance abuse arrested his development.” (Hosch’s brief, at p. 129.) Hosch did not present this argument in the trial court, so we review for plain error only.
The constitutional right recognized in Roper was limited to those defendants who were under the chronological age of 18 years when they committed their capital offenses. Hosch was 20 years old when he murdered Joel Willmore, so Roper has no application here. In re Hill, 437 F.3d 1080, 1082 n. 1 (11th Cir.2006). Hosch failed to establish any error, and certainly not plain error, as to his claim that Roper v. Simmons rendered his death sentence unconstitutional.
XX.
Hosch’s final argument is that evolving standards of decency have rendered lethal injection unconstitutional. Hosch did not raise this argument in the trial court, so we review for plain error. Rule 45A, Ala. R.App. P.
Hosch has made a bare allegation unsupported by any controlling legal authority. The Alabama Supreme Court rejected this argument in Ex parte Belisle, 11 So.3d 323, 339 (Ala.2008). Of course, we are bound by the decisions of the Alabama Supreme Court. § 12-3-16, Ala.Code 1975. This Court has followed Ex parte Belisle and has rejected, in several cases, the same argument Hosch now presents. See, e.g., Jackson v. State, [Ms. CR-07-1208, March 29, 2013] — So.3d -, - (Ala.Crim.App.2010) (opinion on return to remand); Scott v. State, [Ms. CR-08-1747, Oct. 5, 2012] — So.3d -, - (Ala.Crim.App.2012), and cases cited therein; Reynolds v. State, 114 So.3d 61, 157-58 (Ala.Crim.App.2010), and cases cited therein.
Hosch has presented no new arguments or any legal basis whatever for departing from the controlling precedent in Ex parte Belisle. Hosch has thus failed to establish plain error, and is not entitled to relief on this claim.
XXI.
Section 13A-5-53, Ala.Code 1975, requires that' we address the propriety of Hosch’s capital-murder convictions and his sentence of death. Hosch was indicted for, and was convicted of, murdering Joel Will-more during’ the course of a robbery and during the course of a burglary, violations of § 13A-5-40(a)(2) and (a)(4), Ala.Code 1975. The jury recommended, by a vote of 10-2, that Hosch be sentenced to death. The circuit court chose to follow the jury’s recommendation and sentenced Hosch to death.
The record shows that Hosch’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The trial court found as aggravating circumstances that the murder was committed during the course of robbery and a burglary, § 13A-5-49(4), Ala.Code 1975, and that the murder was committed by Hosch while he was under a sentence of imprisonment, § 13A-5-49(l), Ala.Code 1975. The court found two statutory mitigating circumstances — that Hosch had no significant history of prior criminal activity, § 13A-5-51(l), Ala.Code 1975, and Hosch’s age at the time of the crime, § 13A-5-51(7), Ala.Code 1975. The trial court considered all the nonstatutory mitigating circumstances proffered by Hosch, but accorded them little weight.
The trial court determined that the aggravating circumstances outweighed the *1122 mitigating circumstances, and sentenced Hosch to death. This Court has independently weighed the aggravating circumstances and the mitigating circumstances as required by § 13A~5-53(b)(2), Ala.Code 1975, and is convinced, as was the trial court, that death is the appropriate sentence.
Hosch’s death sentence is not disproportionate or excessive when compared to the penalties imposed in similar cases. § 13A-5-53(b)(3), Ala.Code 1975. See Belisle v. State, 11 So.3d 256, 322 (Ala.Crim.App.2007) (listing robbery/murder cases and burglary/murder cases in which the death penalty was imposed), aff'd, 11 So.3d 323 (Ala.2008).
As required by Rule 45A, Ala. R.App. P., this Court has searched the record for any error that may have adversely affected Hosch’s substantial rights with regard to Hoseh’s capital-murder convictions and his death sentence, whether the error was brought to the attention of the trial court or to our attention. We have found no plain error or defect in these criminal proceedings.
For the foregoing reasons, we affirm Hosch’s capital-murder convictions and his sentence of death.
AFFIRMED.
WINDOM, P.J., and KELLUM, BURKE, and JOINER, JJ., concur.

. Although the burglary and theft convictions were mentioned in the notice of appeal, Hosch made no arguments regarding them in his briefs on appeal. Therefore, we are not addressing those convictions.

. The law-enforcement officer who initially recorded the serial number in his report testified that he mistakenly wrote "SI” rather than "SI.” During the trial, the guns were referred to as the "SI gun” and the "TD gun,” and those designations will be used in this opinion.

. Hosch has implicitly recognized this point because, in his reply brief to this Court, his argument is that the record contains no race-neutral explanation for the disparate treatment of L.H. with respect to L.T., a white veniremember who expressed opposition to the death penalty.

. References to a supplemental record filed with this Court will be designated “Supp. C.,” and will be followed by the page number(s) of the record.

. Hosch argues in his initial brief that defense counsel requested that the court give a limiting instruction, and he cites to C. 296. (Hosch's brief, at p. 28.) That page of the record is part of a pleading styled “Defendant's Objection to the Prosecution's Use of Defendant's Alleged Prior Wrongs, Crimes, or Acts.” After arguing in that pleading that evidence of Hosch's prior crimes and bad acts was inadmissible, Hosch also requested that the court issue a limiting instruction “explaining that the evidence may only be considered for the limited purpose for which it is found to be admissible.” (C. 297.) This pretrial request was not sufficient to preserve this issue for appellate review.

. In response to the State’s pretrial notice of its intent to admit evidence of Hosch’s prior criminal activity, Hosch filed an objection. (C. 294-98.) Hosch identified that evidence as: "a) Evidence of a prior convictions for misdemeanors and violations; b) Evidence of Mr. Hosch’s plea agreement to a 2007 drug possession in Madison County that was dismissed.” (C. 294.) To the extent Hosch is attempting to argue that this objection to Rule 404(b) evidence encompassed the evidence to which he now objects, that attempt fails. Hosch never argued to the trial court that the testimony about his escape violated Rule 404(b).

. As the State correctly points out in its brief, the jury was well aware that Hosch was on escape status from prison when these crimes occurred, so even if the lineups had implied to the jury that Hosch had a prior criminal history, any error would have been harmless.

. Nancie Jones, a forensic scientist employed with DFS, testified at Hosch’s trial that she performed the comparison of DNA from a , swab taken from the murder weapon to Hosch's DNA profile, and identified a match. (R. 1369-70.)